**NORWALK CORE, a/k/a Norwalk Chapter of the Congress of Racial Equality and Roodner Court Fair Rent Association, etc., et al., Plaintiffs,**

v.

**NORWALK BOARD OF EDUCATION, a/k/a the Board of Education of the City of Norwalk, Connecticut, Defendant.**

Civ. No. 12624.

United States District Court
D. Connecticut.

March 13, 1969.

214

See also D.C., 298 F.Supp. 203, 208, 210.

After a five day combined hearing on plaintiffs' motion for a preliminary injunction and trial on the merits, Rule 65(a) (2), Fed.R.Civ.P., the Court holds that the action of the Board of Education in implementing its Policy 5122a does not deny plaintiffs the equal protection of the laws. The evidence adduced clearly demonstrates that the Board created reasonable non-racial classifications to insure that high quality integrated education would be available to all children of Norwalk.

Accordingly, plaintiffs' motion for a preliminary injunction is denied and the complaint is dismissed on the merits.

## PARTIES TO THE ACTION

Plaintiffs are two minor children (one Black and one Puerto Rican) suing for themselves and others similarly situated, together with two associations suing as representatives of those of their members with children claimed to be adversely affected by the practices in dispute. The Court heretofore, after a hearing, entered an order permitting the action to be maintained as a class action and directing that notice of pendency of the action be given to all members of the respective classes.[1]

Other Black and Puerto Rican families, opposed to the position advocated by plaintiffs, previously moved to intervene as defendants; this motion was denied.[2]

Defendant is the Norwalk Board of Education, sued in its official capacity with respect to its duty to provide elementary education for the children of Norwalk.

## CLAIMS OF THE PARTIES

Plaintiffs seek (i) a declaratory judgment that their constitutional rights are impaired by the present policies of the Board of Education; (ii) injunctive relief against the continua-

Jonathan W. Lubell, of Lubell & Lubell, New York City, and Stephen L. Fine, Westport, Conn., for plaintiffs.

Robert H. Rubin, Special Corporation Counsel of City of Norwalk, South Norwalk, Conn., for defendant.

## MEMORANDUM OF DECISION AFTER TRIAL

TIMBERS, Chief Judge.

### QUESTION PRESENTED

The question here presented is whether defendant Board of Education's operation of elementary schools in Norwalk denies plaintiffs the equal protection of the laws guaranteed by the Fourteenth Amendment of the Constitution of the United States. Specifically, plaintiffs challenge the Board's action in busing Black and Puerto Rican children out of Black neighborhoods to white neighborhood schools without maintaining Black neighborhood schools and cross-busing white children to such Black neighborhood schools.

---

1. See Class Action Order of October 28, 1968, 298 F.Supp. 210 (D.Conn.1968).

2. See Memorandum of Decision of September 17, 1968 Denying Applicants' Motion to Intervene as Defendants, 298 F.Supp. 208 (D.Conn.1968).

tion of these policies; and (iii) a mandatory injunction requiring the Board to submit to the Court a plan reestablishing neighborhood integrated schools in all neighborhoods of Norwalk. Defendant does not dispute the underlying facts, but it denies the inference of racial classification drawn by plaintiffs; and it pleads various special defenses, including plaintiffs' lack of standing, failure to join necessary parties and failure to exhaust administrative remedies.

At an earlier stage, the Court denied, after a hearing, plaintiffs' application for a temporary restraining order to prevent defendant from closing one of the Norwalk elementary schools pending determination of plaintiffs' motion for a preliminary injunction.[3]

## JURISDICTION

This Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. §§ 1983, 1988 (1964), and 28 U.S.C. § 1343(3) and (4) (1964).

## FINDINGS OF FACT

(1) Plaintiff minor children, individually and as representatives of a class, are Black and Puerto Rican children who formerly attended a neighborhood school, or would have attended such a school but for the means by which defendant implemented a policy to promote racial balance in the elementary schools of Norwalk. Plaintiff associations represent those of their members who are parents of children in similar circumstances.

(2) Defendant is the Norwalk Board of Education.

(3) The complaint seeks to enjoin the enforcement, operation and execution of defendant's Policy 5122a by restraining the action of defendant upon the ground that its action contravenes the equal pro-

tection clause of the Constitution of the United States.

(4) Neighborhoods formerly served by the Nathaniel Ely, West Avenue and Columbus-Lincoln elementary schools primarily are composed of Black and Puerto Rican residents.

(5) The population of the City of Norwalk in 1968 was more than 76,000.

(6) During the 1967–68 school year (the most recent time for which such statistics are available), the number of Black and Puerto Rican elementary school children bused to schools out of their respective districts was 775 out of a total Black and Puerto Rican enrollment of 1581;[4] at the same time, the number of white elementary school children bused to schools out of their respective districts was 39 out of a total white enrollment of 7934.[5]

(7) It is undisputed that any inconveniences caused by such busing primarily are borne by Black and Puerto Rican elementary school children.

(8) Policy 5122a,[6] adopted by defendant on November 27, 1962 and adhered to continuously up to and including the present time, has as its objective the provision of high quality education through increased intergroup learning experiences. In addition, this policy affirms the advantages of the neighborhood school system, such as a local social structure and avoidance of the financial burdens of transportation.

(9) The District Committee Report of February 7, 1964 (modified March 5, 1964) proposed improvement of racial balance in elementary schools by fixing the non-white enrollment at between 8% and 25% of the student body.

(10) The District Committee Report further proposed preservation of the neighborhood school concept; it proposed, however, that non-white pu-

3. See Memorandum of Decision of September 4, 1968 Denying Plaintiffs' Application for a Temporary Restraining Order, 298 F.Supp. 203 (D.Conn.1968).

4. Racial Balance in the Schools (October 11, 1967), Pl.Ex. 4.

5. Racial Balance Survey (October 1, 1967), Pl.Ex. 5.

6. Policy 5122a is set forth in full, *infra* note 12.

pils in the Nathaniel Ely, West Avenue and Columbus-Lincoln districts be transported to other elementary schools located in predominantly white neighborhoods.

(11) The District Committee Report also recommended the replacement of the West Avenue facility, the closing of the Lincoln facility, and the closing of the Columbus facility if the white exodus from the latter neighborhood continued.

(12) Implementation of Policy 5122a and the District Committee Report has had the consequences immediately hereinafter set forth.

(13) *As to the Nathaniel Ely School* (constructed 1957)

(a) By the school year commencing September, 1965, grades 1–6 had been abolished.

(b) During 1968 kindergarten classes were abolished in order to integrate Ely programs with full school programs available at other schools.

(c) A 1963 proposal voluntarily to bus white children out of the overcrowded Brookside School into the Ely School failed because of absence of a favorable response from the white community.

(d) In view of local Black hostility to the location of a vocational arts center in the Ely facility, the facility was leased instead for five years to the Norwalk Community College.

(e) White children who formerly attended Ely were not bused to schools in other neighborhoods, but were transferred to schools in nearby districts.

(14) *As to the West Avenue School* (constructed 1909)

(a) This school was closed in one step and the students were distributed among schools in other districts.

(b) Abandonment was necessitated by the construction of Route 7 by the State of Connecticut.

(c) The facility was used for one year beyond the anticipated takeover by the State, but concern for pupil safety in the midst of increased construction activity eventually resulted in its abandonment.

(d) A plan for a substitute school in the West Avenue neighborhood never was implemented; instead, additions were constructed at other existing schools.

(e) Approximately 12 to 14 Black children who formerly attended this facility now walk to nearby schools.

(f) Some 39 white children who formerly attended this facility now are bused elsewhere, for reasons other than racial balance.

(15) *As to the Columbus and Lincoln Schools*

(a) The Lincoln School (constructed 1902) was demolished because it was obsolete: it contained a wooden core, had lavatory facilities only in the basement, did not have an assembly hall or gymnasium, and was not fireproof.

(b) The Columbus School (constructed 1938), located in a predominantly Black and Puerto Rican neighborhood, presently is in use and has the highest non-white percentage enrollment (33%) of all the Norwalk elementary schools.

(c) To improve the racial balance at the Columbus School, white children were transferred from Ely to Columbus.

(16) New facilities have not been constructed in areas of predominantly Black and Puerto Rican population since the construction of the Nathaniel Ely School in 1957.

(17) Whereas the West Avenue School was closed because of the construction of Route 7, and the Lincoln School was closed because it was obsolete, the Ely School was closed solely to achieve racial balance.

(18) Since the closing of the Ely School was motivated more by race re-

lated factors than the closing of other schools in Norwalk, if plaintiffs cannot prevail with respect to the Ely School, their entire case, of necessity, must fail; therefore, the Court has focused primarily on the events preceding and following the closing of the Ely School.

(19) From 1962 to the present, the Board has not acted unilaterally but always in the light of recommendations by other public bodies in Norwalk, after public hearings, and with concern for the best interests of the student, the general public, and the taxpayer.

(20) In assessing alternative proposals to achieve racial balance, the Board has recognized the existence of racial hostilities and fears.

(21) Policy 5122a, adopted after open meetings attended by members of the community, represented a solution to the problem of racial imbalance which the majority of the community was willing to accept.

(22) Throughout the relevant period, defendant acted in the utmost good faith, in a nonarbitrary and deliberate manner, in order both to insure racial balance and to provide high quality education.

(23) Policy 5122a reflects a considered balance between the desirability of integration by the reduction or elimination of segregated schools and the retention of neighborhood schools where possible; achievement of the former objective was primary.

(24) The bad reputation of the neighborhood around the Ely School; the belief that the attitudes and fears of parents concerning attendance of their children at this school would be carried over to and reflected by their children (thus interfering with the attainment of a high quality educational experience); the belief that the Board was more competent to deal with problems incident to the psychological adjustment which might have to be made by a minority group child attending a school located in a predominantly white neighborhood, than the apprehensions of a white child regarding attendance at a school in an undesirable neighborhood; the fact that 75% of the Ely student body would have to be bused into Ely in order to insure racial balance, and consequently 75% of the resident minority group population would have to be bused out into white neighborhoods (in the same manner as they are bused under the present plan); and the fact that extracurricular activities inevitably would be curtailed because of the reluctance of many students, teachers and parents to participate in this neighborhood—all these factors influenced the ultimate decision of the Board to phase out elementary education at the Ely School.

(25) If the Ely School were reopened, the quality of education there available would be inferior to that presently available at other elementary schools in Norwalk.

(26) The policies of the Board do not discriminate against racial minorities as such; discrimination, if any, is against those neighborhoods less desirable for the location of an educational facility than other neighborhoods.

## CONCLUSIONS OF LAW

(1) The complaint herein sets forth a justiciable controversy between the parties. The Court has jurisdiction of this action under 42 U.S.C. §§ 1983, 1988 (1964), and 28 U.S.C. § 1343(3) and (4) (1964).

(2) Closing schools in certain neighborhoods, and busing children formerly attending those schools to other neighborhood schools, does not violate the equal protection clause of the United States Constitution.

(3) Absent a prior history of de jure segregation, there is no constitutional right to an integrated education; a community, therefore, has no constitutional duty to remedy de facto segregation in its schools.

(4) A neighborhood school system is not objectionable on constitutional grounds unless used to promote or preserve de jure racial discrimination.

(5) Location of public school facilities, equally available and accessible to all residents of a community, does not provide a basis upon which judicial action can be premised.

(6) The law does not require that all neighborhoods for public school purposes be regarded as equal; neighborhood inequality, therefore, may be recognized by a school board in planning the location and operation of educational facilities.

(7) A school board has neither the power nor the duty to rectify neighborhood living patterns.

(8) The Court should scrutinize closely a school board's classification of children allegedly made along racial lines; but such classification will be struck down on constitutional grounds only if shown to be not necessary to the establishment of a permissible state objective.

(9) The Court will not strike down discretionary administrative decisions of a school board so long as those decisions do not transgress the mandate of the Constitution.

(10) Since the Norwalk Board of Education here created reasonable nonracial classifications to insure that high quality integrated education would be

available to all children of Norwalk, plaintiffs have not been denied the equal protection of the laws.

(11) Plaintiffs are not entitled to a preliminary injunction.

(12) Defendant is entitled to judgment dismissing the complaint on the merits.

## OPINION

### I

Until 1962 the City of Norwalk, a community of more than 76,000 residents,[7] provided elementary education by means of a strict neighborhood school system. Because of socio-economic living conditions, de facto segregation prevailed in these schools. In three schools in particular—Nathaniel Ely, Columbus-Lincoln,[8] and West Avenue—the Black enrollment was 50.6%, 46.5% and 60.1% of the respective student bodies.[9] The percentage of Black enrollment in other elementary schools was less than 12%.[10] This de facto segregation resulted "from the action of pupil assignment policies not based on race but upon social or other conditions for which [the] government cannot be held responsible . . . ."[11]

Recognizing the desirability of providing improved intergroup learning experiences, the Norwalk Board of Education, with the announced objective of giving every child in Norwalk the best possible education, adopted Policy

---

7. State of Connecticut Register and Manual, 462 (1968).

8. The Columbus and Lincoln schools actually were two separate schools, but will be treated as one for purposes of this opinion.

9. Racial Balance in the Schools (October 14, 1968), Def.Ex.Y, (1963 figures). This exhibit is set forth in full, *infra* note 14.

10. *Id.*

11. Hobson v. Hansen, 269 F.Supp. 401, 493, (D.D.C.1967), appeal dismissed, 393

U.S. 801 (1968). See also Annotation, De Facto Segregation of Races In Public Schools, 11 A.L.R.3d 780, 782 (1967):

" . . . the phrase 'de facto segregation' signifies situations in which some of the public schools are attended exclusively or predominantly by students of one race, ordinarily Negro students, and the racial imbalance of such schools results from their geographical location or other factors which are not discriminatory by themselves, and not from intentional discriminatory state action, past or present."

5122a [12] on November 27, 1962. This policy was promulgated after public hearings at which alternative proposals were considered. In addition to the best interests of all the children, the Board considered the financial and psychological impact of other plans (T. 172–73). At the same time, however, the Board, in order to achieve its goal, declined to abandon the neighborhood school policy:

"We also believe that neighborhood schools have important advantages both in providing a local social structure for children and in avoiding a

12.

NORWALK BOARD OF EDUCATION

POLICY 5122a

Provisions for Intergroup Experiences and
the Determination of School Districts

Our objective and duty is to give every child in Norwalk the best possible education. We have followed a policy of providing equal educational opportunity without regard to the race, color, or creed of any child and shall continue this policy.

Intergroup experiences are desirable in helping children learn appreciation and respect for the various groups comprising our population. Mutual respect is developed by such experiences. In the absence of desirable intergroup experiences, members of an underprivileged minority group are more likely to lack motivation and incentive for doing their best. This is brought out in the Statement of Policy adopted by the New York Board of Regents on January 28, 1960:

"Modern psychological knowledge indicates that schools enrolling students largely of homogeneous, ethnic origin, may damage the personality of minority group children. Such schools decrease their motivation and thus impair the ability to learn. Public education in such a setting is socially unrealistic, blocks the attainment of the goals of democratic education, and is wasteful of manpower and talent, whether this situation occurs by law or by fact."

We also believe that neighborhood schools have important advantages both in providing a local social structure for children, and in avoiding a major financial problem in providing transportation.

Policies

The Board adopts the following policies in order to implement the above principles:

1. The Board of Education will encourage housing authorities, real estate interests, employers, and recreational and social agencies to work actively in solving housing and other urban problems of racial concentration.

2. If any schools presently or in the future should be populated largely by members of an underprivileged minority, we shall try to find ways that are educationally sound and economically feasible to obtain better racial distribution. These ways might include changing the school so that it would serve a larger area, at least for some programs. We would not, however, seek to have the enrollment of a school conform to a rigid pattern of racial distribution. If the school plant is obsolete, it may be desirable to convert it to non school use, or to raze it.

3. In planning new school districts, we shall seek to avoid or reduce racial concentrations as much as possible.

4. In addition to attending the same schools, desirable intergroup experiences should be provided by means of system-wide projects such as:
 A. Exchange of assembly programs;
 B. System-wide play-day and athletic programs;
 C. Sharing outdoor educational experiences at Oak Hills Park.
 D. Develop curriculum materials that contribute to respect for an appreciation of the culture and contributions of various ethnic, national, and religious groups.
 E. Provide our teachers with in-service training in intergroup relations.

5. We should continue to do the best we can to promote the maximum educational development of every pupil. We should recognize that underprivileged children frequently have greater need for guidance and health services and may have greater need for special instructional assistance.

Adopted by the Board of Education November 27, 1962.

major financial problem in providing transportation." [13]

The consequences of the implementation of this policy have been the abandonment of neighborhood schools formerly servicing school districts composed predominantly of Black and Puerto Rican students; absence of construction of new facilities in these districts; and the busing of ghetto students who formerly attended the abandoned schools to schools in other neighborhoods where the residents and students are predominantly white. While statistics demonstrate that integration thus has been achieved,[14] plaintiffs allege that it has been achieved at the price of deprivation of the "recognized benefits" of the neighborhood schools for those Black and Puerto Rican students being bused.

At the trial, plaintiffs' direct evidence consisted of the testimony of two witnesses,[15] both of whom were members of

13. Policy 5122a, *supra* note 12. Concern for the partial preservation of a local school structure was subordinated to the objective of achieving quality education through integration (T. 467).

14.

RACIAL BALANCE IN THE SCHOOLS

COMPARISON SHEET—12/1/63 – 10/1/68

| ELEMENTARY | 1963 (a) | 1964 | 1965 | 1966 | 1967 | 1968 |
|---|---|---|---|---|---|---|
| Broad River | 1.0 | .3 | 9.66 | 8.66 | 9.05 | 9.63 |
| Brookside | 2.1 | 10.0 | 5.89 | 10.69 | 10.59 | 13.41 |
| Columbus | 46.5 | 24.5 | 27.95 | 36.16 | 38.78 | 32.97 |
| Cranbury | .6 | 6.4 | 7.16 | 5.80 | 9.59 | 17.56 |
| Fitch | 12.8 | 13.1 | 12.80 | 18.11 | 20.19 | 21.21 |
| Fox Run | 10.0 | 9.3 | 8.30 | 7.41 | 9.47 | 11.87 |
| Honeyhill | .2 | 7.7 | 11.29 | 12.35 | 14.60 | 17.07 |
| Jefferson | 5.5 | 6.3 | 10.20 | 9.18 | 11.33 | 11.30 |
| Kendall | 3.3 | 4.0 | 5.30 | 12.78 | 16.28 | 14.37 |
| Magrath | 12.3 | 10.8 | 10.40 | 13.65 | 15.39 | 16.66 |
| Marvin-Ludlow | 13.8 | 14.7 | 15.45 | 17.23 | 18.09 | 17.15 |
| Naramake | 9.0 | 10.6 | 10.85 | 14.28 | 15.65 | 16.49 |
| Roosevelt | 3.1 | 15.8 | 19.05 | 18.32 | 18.87 | 17.86 |
| Rowayton | 6.7 | 5.8 | 5.57 | 6.29 | 7.15 | 10.11 |
| Silvermine | – | 1.4 | 10.96 | 10.58 | 12.72 | 12.65 |
| Tracey | 15.6 | 17.6 | 17.93 | 24.19 | 25.97 | 27.11 |
| Washington | 10.8 | 14.9 | 17.06 | 17.66 | 16.46 | 22.26 |
| West Avenue | 60.1 | 66.9 | 68.50 | – | – | – |
| Winnipuak | 5.7 | – | – | – | – | – |
| Wolfpit | – | 10.1 | 8.65 | 9.94 | 10.21 | 17.14 |
| TOTAL ELEMENTARY | 12.0 | 13.0 | 13.82 | 14.40 | 16.07 | 17.01 |
| Nathaniel Ely | 50.6 | 50.7 | 70.00 | 71.68 | 61.53 | 79.26 (b) |
| | (K–5) | (K–5) | (K–PreK) | (K–PreK) | (K–PreK) | (PreK) |

(a) Figures represent percentage Black enrollment.

(b) Ely figures were listed separately. Symbols in parenthesis indicate grades served by the school in the specific year; i. e., (K–5) means kindergarten through fifth grade; (PreK) means prekindergarten.

Black enrollment comprises 17% of the elementary school total. These children were distributed among the various Norwalk elementary schools, with percentage Black enrollment ranging from a low of 9.63% to a high of 32.97% in 1968. The trend is toward an even more racially balanced enrollment.

———◆———

15. In addition, two rebuttal witnesses were called, one a resident of one of the affected neighborhoods and the other an elementary school teacher.

the Board during the evolutionary period of the controversial policy. In large part, their testimony concerned historical developments preceding the instant litigation. Plaintiffs offered little, if any, evidence concerning the alleged psychological effects which busing and attendance at a non-neighborhood integrated school has had or may have upon Black and Puerto Rican children. Instead, plaintiffs rested their legal claims on the assertion that one-way busing based upon racial classification violates the constitutional guarantee of equal protection of the laws.

In view of this, the Court regards the claims before it not as directed at a denial of equal educational opportunity—such opportunity admittedly being the objective of the present Board policy—but as challenging only the means by which the Board has implemented that policy by providing such equal educational opportunity.[16] The issue in controversy, therefore, is whether plaintiffs unconstitutionally are being denied their claimed right to a neighborhood school and their claimed right to have the "burdens" of busing shared equally by all elements of the community.

The Court holds that the "burdens", if any, of busing and attendance at a non-neighborhood school, although statistically related to race, actually stem from a valid administrative decision against the continued location and building of educational facilities in areas of underprivileged minority group concentration because of the detrimental effects on quality education which might result.

## II

A neighborhood is not an abstract concept but is dependent for its content upon the social and economic components which make up the neighborhood. It must be recognized that, while neighborhoods theoretically may be created equal, as a practical matter they do not remain equal and the law does not command that they be treated equally. Zoning regulations illustrate discriminatory treatment of neighborhoods. Thus, just as one neighborhood may afford a more suitable location for a factory, another may provide a more suitable environment for the location of a school. Regarding the needs of all children of Norwalk as paramount in the selection of a site for a school, the Board, in good faith and without improper racial motivation or arbitrary disregard of the rights of a minority, concluded that educational facilities should not be maintained and constructed in plaintiffs' neighborhoods. Such decision did not render access to the facilities it did provide financially burdensome or psychologically harmful. A school board may make such determination free of judicial intervention where the correlation of its policy with apparent racial discrimination is justified on nonracial grounds.

It is fundamental that the rights of individuals in similar circumstances must be governed by the same rules; but it is doubtful that residents of one neighborhood appropriately may claim the benefits of circumstances similar to those of another, where a neighborhood classification has been made. The fact that the instant controversy focuses upon an educational facility does not materially distinguish it from an action involving the location of any public facility. Plaintiffs have not attempted to establish that school location provides any impediment to education. Instead, they have relied upon a per se approach equally applicable to the location of a noneducational public facility.

That there is a correlation between the less desirable (from the standpoint of location of schools) neighborhoods of Norwalk and neighborhoods of predominantly Black and Puerto Rican

---

16. For a discussion of this issue, see Memorandum of Decision Denying Applicants' Motion to Intervene as Defendants, 298 F.Supp. 208 (D.Conn.1968).

population,[17] appears from the record. It is a fact which may be recognized by a school board seeking desirable locations for school facilities. It does not follow, however, that the resultant discrimination, if any, is racial.

In adopting Policy 5122a, the Board recognized that the neighborhood school has certain abstract advantages. In implementing that policy, the Board likewise recognized that these abstract advantages were dependent upon, and might be outweighed by, the very real disadvantages incident to location in certain neighborhoods, such as the Ely Avenue district. Had the Board ignored this reality, it might well not have fulfilled its duty of providing the best education for all children of Norwalk.

### III

Since, on its face, the action of the Norwalk Board of Education appeared to involve a racial classification which might be said to be "constitutionally suspect", the Court has given the Board's justification the "most rigid scrutiny" and subjected it to "a far heavier burden of justification".[18]

■ Although there is administrative discretion to differentiate treatment of one group from another, and indeed a presumption often is recognized in favor of the validity of such discriminatory administration where "any state of facts reasonably may be conceived to justify it",[19] substantial and legitimate governmental objectives may not be pursued by means which abridge the rights of some when less drastic means are available to achieve the same purpose.[20] In the instant case, however, the question of the availability of less drastic means to achieve the same purpose has not been reached, since the Court holds that the Board, to whom such choice initially is committed, has not abridged the rights of the Black and Puerto Rican community: there is no right to a neighborhood school; there is no right not to be bused; and there is no right requiring equal treatment of that which is in fact unequal (here, neighborhoods). Although *people* are equal and governmental classification by race will not be tolerated, *neighborhoods* are not. Reasonable administrative discrimination between neighborhoods in determining the location of public facilities such as schools is not subject to judicial intervention where those facilities remain available for use by all—particularly, as here, absent proof that such use is adversely affected by any required transportation. This Court will not intervene and strike down discretionary decisions of the administrative and legislative branches of government, so long as those decisions do not transgress the mandate of the Constitution. Judicial redress is not available where the rights of citizens have not been violated.

A limited mandate has been given this Court. It permits intervention in the social and political relationships between the individual and his government

---

17. See testimony of Captain Prato of the Norwalk Police Department (T. 598–622). Plaintiffs' claim of racial, as opposed to neighborhood, classification would be more credible if evidence had been offered to demonstate that educational facilities continue to operate in so-called white high crime rate areas of Norwalk. Plaintiffs, however, appeared defensive when confronted with the testimony of Captain Prato and members of the Board concerning psychological attitudes of children both Black and white relative to attendance at an undesirable facility. Only by the testimony of John Mosby (T. 721–34) did they seek to contradict defendant's case in this respect.

18. Hunter v. Erickson, 393 U.S. 385, 392 (1969), citing Loving v. Virginia, 388 U. S. 1, 10 (1968), McLaughlin v. Florida, 379 U.S. 184, 194 (1964), Bolling v. Sharpe, 347 U.S. 497, 499 (1954), and Korematsu v. United States, 323 U.S. 214, 216 (1944).

19. McGowan v. Maryland, 366 U.S. 420, 425–26 (1961).

20. Shelton v. Tucker, 364 U.S. 479, 488 (1960). See Blocker v. Board of Education, 226 F.Supp. 208, 224 (E.D.N.Y. 1964).

only in rare instances. This is not one of them. That one racial group prefers a different solution to a problem than that which has been decided upon by a school board acting in good faith, does not, without more, entitle such group to judicial redress.

Had the Board never adopted Policy 5122a, neighborhood segregated schools would still exist in Norwalk and plaintiffs would not be entitled to judicial redress. Notwithstanding racial overtones, the crux of this litigation is an attempt by one group of residents to overturn a discretionary decision of the Board which they believe has given something desirable to another group of residents. Due to the pre-existing racial living pattern with which the Board was confronted, racial overtones necessarily were inherent in its decision. The Board, lacking both the authority and the legal obligation to rectify neighborhood living conditions, adopted educational policies molded to deal with the highly sensitive situation presented. It has made a good beginning toward its ultimate goal: the provision of high quality integrated education for all children. There is nothing in the record other than sheer speculation to indicate that the realization of this goal for Black and Puerto Rican children has been affected by their compelled attendance at non-neighborhood schools. The overwhelming weight of the evidence was to the contrary: it indicated that reopening or building of ghetto facilities would almost certainly nullify the overall advantages of quality integrated education.

## IV

 Since "communities have no constitutional duty to undo bona fide de facto segregation",[21] Norwalk voluntarily has undertaken that which many communities have been reluctant to undertake even where legal compulsion exists. Absent a prior history of de jure segregation, if a neighborhood school system has been equitably administered without regard to race, theoretical mobility is believed to exist by which movement can be made between neighborhoods, and thus between schools. This view, articulated in Deal v. Board of Education, 369 F.2d 55 (6 Cir. 1966), cert. denied, 389 U.S. 847 (1967), recognizes that private and economic barriers deter implementation of this theoretical mobility, but would limit the mandate of Brown v. Board of Education, 347 U.S. 483 (1954), to rectification of legally enforced segregation:

> "We hold that there is no constitutional duty on the part of the Board to bus Negro or white children out of their neighborhoods or to transfer classes for the sole purpose of alleviating racial imbalance *that it did not cause*, nor is there a like duty to select new school sites solely in furtherance of such a purpose." 369 F.2d at 61 (emphasis added).

This rationale remains viable following the recent trilogy on the adequacy of certain freedom of choice and free transfer plans. Green v. County School Board, 391 U.S. 430 (1968); Raney v. Board of Education, 391 U.S. 443 (1968); Monroe v. Board of Commissioners, 391 U.S. 450 (1968). In these cases the Court was concerned with school systems formerly operated under de jure segregation.[22]

The question of unremedied de facto segregation did not confront this Court in the instant controversy; instead, the issue, though distinct, was one of comparable complexity and sensitivity. While tangentially related to the problem of equal educational opportunity, plaintiffs' claim concerned the equal protection aspects of the *means* by which such equal educational opportunities should be provided. The integration policy of Norwalk met the standard announced in *Green, supra*, at 438, that "a school board [should] come forward

---

21. Offermann v. Nitkowski, 378 F.2d 22 (2 Cir. 1967).

22. See The Supreme Court—1967 Term, 82 Harv.L.Rev. 63, 111 (1968).

with a plan that promises realistically to work *now*." [23]

To prevail in the instant action, plaintiffs would have had to establish that there had been "government action which without justification impose[d] unequal burdens or award[ed] unequal benefits . . .." [24] There was no dispute that the actions of the Board constituted government action; nor could it be reasonably disputed that the "burdens" of busing, if any, had been and are imposed upon all students in Norwalk not within walking distance of a public elementary school. The so-called white community is said to have been given the "advantage" of having its children attend neighborhood schools. At the same time, however, the so-called Black and Puerto Rican community has been given the *advantage* of having its children attend schools where they can receive the recognized benefits of an integrated educational experience; such is an advantage, not a right.

All children, Black and Puerto Rican, as well as white, have certain rights which may not be abused regardless of how commendable the end being sought:

"In attempting to formulate a plan which will provide equal educational opportunities to a minority group, it is elementary that the plan should not at the same time deprive the majority group of its constitutional rights." [25]

The Board in the instant case, in tailoring its plan to the realities of Norwalk and preserving neighborhood schools in certain neighborhoods, even though

these are white, has recognized that the majority group students have certain rights as well.

As was stated in Deal v. Board of Education, *supra,* at 61:

"In dealing with the multitude of local situations that must be considered and the even greater number of individual students involved, we believe it is the wiser course to allow for the flexibility, imagination and creativity of local school boards in providing for equal opportunity in education for all students. It would be a mistake for the courts to read *Brown* in such a way as to impose one particular concept of educational administration as the only permissible method of insuring equality consistent with sound educational practice. We are of the view that there may be a variety of permissible means to the goal of equal opportunity, and that room for reasonable men of good will to solve these complex community problems must be preserved."

Things which are different in fact need not be treated as though they were the same. Special burdens may be imposed upon a defined class to achieve a permissible purpose where the definition of class has been reached in a manner highly relevant to the purpose being sought. Rinaldi v. Yeager, 389 U.S. 305 (1966).

One court has held that "[t]he neighborhood school policy certainly is not sacrosanct. It is valid only insofar as it is operated within the confines established by the Constitution." [26] And

---

23. As indicated above, *Green* involved a situation of prior de jure segregation.

24. Hobson v. Hansen, *supra* note 11, at 497. See also Thompson v. Shapiro, 270 F.Supp. 331, 338 (D.Conn.1967): "[I]n any case where the government confers advantages on some, it must justify its denial to others by reference to a constitutionally recognized reason."

25. Olson v. Board of Education, 250 F. Supp. 1000, 1007 (E.D.N.Y.1967). See also Springfield School Committee v. Barksdale, 348 F.2d 261, 264 (1 Cir. 1965).

26. Taylor v. Board of Education, 191 F. Supp. 181, 195 (S.D.N.Y.), aff'd, 294 F. 2d 36 (2 Cir.), cert. denied, 368 U.S. 940 (1961).

where the neighborhood school system is not used to promote or preserve racial discrimination, it is not objectionable on constitutional grounds.[27]

## CONCLUSION

Having applied the "heavier burden" test of Loving v. Virginia, 388 U.S. 1, 11 (1967),[28] to the socio-economic justification offered by the Board, and having given appropriate weight to the uncontradicted expert opinions of members of the Board who explained the nonracial considerations which motivated their actions,[29] the Court holds that defendant clearly is entitled to judgment in its favor.

▆▆▆ Norwalk voluntarily has integrated its elementary school system by a plan which has eliminated the neighborhood school in underprivileged minority areas. Both the integration and the elimination have been undertaken with the same goal: the attainment of quality education for all children of Norwalk. Since the Board's action clearly was within the scope of the law, protests by certain segments of the Norwalk community are misplaced in seeking relief in the judicial arena. For this Court to intervene in a case such as this would be to discourage voluntary action by enlightened public officials attempting to correct one of the underlying causes of racial tension in this Nation. This Court emphatically refuses to do so.

## ORDER

ORDERED as follows:

(1) Plaintiffs' motion for a preliminary injunction is denied.

(2) The Clerk will enter judgment in favor of defendant dismissing the complaint, but without costs.

---

27. Downs v. Board of Education, 336 F.2d 988 (10 Cir. 1964).

28. "[I]f [racial classifications] are ever to be upheld, they must be shown to be necessary to the accomplishment of some permissible state objective, independent of

the racial discrimination which it was the object of the Fourteenth Amendment to eliminate."

29. See Olson v. Board of Education, 250 F.Supp. 1000, 1009–10 (E.D.N.Y.1967).