**NORWALK CORE et al., Plaintiffs-Appellants,**

v.

**NORWALK BOARD OF EDUCATION, etc., Defendants-Appellees.**

**No. 135, Docket 33645.**

United States Court of Appeals, Second Circuit.

Argued Nov. 14, 1969.

Decided March 10, 1970.

Jonathan W. Lubell, New York City (Lubell & Lubell, and Stephen L. Fine, New York, on the brief), for plaintiffs-appellants.

Frank W. Murphy, Norwalk, Conn. (Robert H. Rubin, Corp. Counsel for the City of Norwalk, Norwalk, Conn., on the brief), for defendants-appellees.

Before MOORE, KAUFMAN and HAYS, Circuit Judges.

MOORE, Circuit Judge.

This action has been brought by two membership associations, Norwalk Core, a/k/a Norwalk Chapter of the Congress of Racial Equality, and Roodner Court Fair Rent Association, and by two public elementary school students (by the parents or next of kin) of Norwalk, Connecticut, for declaratory and injunctive relief. The defendant is the Norwalk Board of Education (the Board). In substance plaintiffs ask a federal court to override the policies of the Board in certain aspects of its current operation of the Norwalk school system and to decree that the Board establish a neighborhood school or schools in Black and Puerto Rican neighborhoods.

After the action was commenced, another group sought to intervene alleging deprivation because of "the policy of racial segregation demanded by the plaintiffs in their complaint in this action." The motion was denied. 298 F.Supp. 208, 209. However, the court held that the action should be maintained as a class action. 298 F.Supp. 210. Although a motion for a temporary restraining order had been denied, 298 F. Supp. 203, the court held a trial on the merits. During the five days of trial, some eight witnesses were heard, including a member and former member of the Board, the Superintendent of Schools, the Directors of Elementary Education, a teacher, a resident in the neighborhood of the Ely School, the Dean of the Norwalk Community College and a captain of the Norwalk Police Department.

In an opinion which reviewed the facts presented on the trial and which carefully analyzed the problems with which the Board had to cope in the light of existing realities, the Court dismissed the complaint, 298 F.Supp. 213.

This case does not call for a treatise on educational theories in vacuo. Nor is it the function of a federal court to resolve the myriad of conflicts which exist amongst educators themselves as to the various questions here involved. The wisdom or the harmful effects of bussing, a neighborhood school in an almost totally Black and Puerto Rican residential area, the percentages of races which should be allotted to each school, these questions are all largely academic unless related to a specific fact situation. The racial ingredients of schools cannot be prescribed with such certainty of a correct optimum result as might be found in a gourmet cook book specifying the proper portions for a de luxe casserole. Here the courts must pass upon an actual—not a hypothetical—situation.

Under our democratic system of government in most of our communities the education of our youth is entrusted by popular consent to a Board of Education, either elected or appointed. Under it are usually a Superintendent of Schools and appointed teachers. Their control, however, is not absolute because fiscal policies are under the supervision of other branches of government and ultimately these policies are made by, or are reviewable by, the voters. And so in Norwalk.

Two problems faced the Board, the physical problem of plant and equipment; the education problem of integration in the light of the facilities available.

On November 27, 1962, the Board adopted "Policy 5122a" entitled "Provisions for Intergroup Experiences and the Determination of School Districts." The policy was couched in generalities. This was necessary because implementation would depend upon the existing situations at various future times. Amongst policy declarations were:

"Our objective and duty is to give every child in Norwalk the best possible education. We have followed a policy of providing equal educational opportunity without regard to the race, col-

or, or creed of any child and shall continue the policy.

"Intergroup experiences are desirable in helping children learn appreciation and respect for the various groups comprising our population. * * * "

* * * * * *

"3. In planning new school districts, we shall seek to avoid or reduce racial concentrations as much as possible."

## THE SCHOOLS PRIMARILY INVOLVED

### The Ely School

Located in a predominantly Black and Puerto Rican area, this school had a substantial racial imbalance. After the adoption of Policy 5122a, various proposals were made by civic groups at and after public meetings. The plans did not meet with success and in September 1965 all classes except kindergarten (closed down later) were discontinued.

### Columbus-Lincoln School

Use of Lincoln because of obsolescence was discontinued at the end of the school year 1964 and the building thereafter demolished. Columbus was inadequate for the Columbus-Lincoln students.

### West Avenue School

Standing in the path of a new highway (U.S. Route 7), this building was condemned and demolished.

The Board, faced with this physical situation, solved it as to Ely by bussing Black students to other schools, white students walking to Columbus; as to Columbus by bussing some 200 Black students from the area to other schools; and as to non-existent West Avenue by having all students bussed or walk to other schools.

The thrust of plaintiffs' complaint is that they are being deprived of a neighborhood school in a predominantly Black and Puerto Rican area. They point to the existence of schools predominantly white in areas also predominantly white.

They do not contend that they have been denied equal educational opportunities. Rather they complain of the *"means* by which such equal education opportunities should be provided," 298 F.Supp. at 224. More specifically, plaintiffs do not assert "an absolute right to a neighborhood school or that they had an absolute right to be free of bussing to a school in a district beyond that in which they resided." What they seek, in effect, is a "continuance of schools in the Black and Puerto Rican communities and bussing of some white students into these schools."

However, the problem confronting the Board at the time of this action was not theoretical; it was how best to maintain a school system consistent with praiseworthy policies of integration with the facilities then available. It had lost Lincoln and West Avenue. Ely had not worked out. The students had to go somewhere. It was all very well for the Board to adopt the policy that:

"1. The Board of Education will encourage housing authorities, real estate interests, employers, and recreational and social agencies to work actively in solving housing and other urban problems of racial concentration."

But it was quite another proposition to rebuild Norwalk overnight or to decree residential desegregation. In the meantime the Board had to exercise its best judgment under the circumstances. And this was the problem to which the district court had to address itself. The findings of fact and the conclusions of law set forth in the court's opinion are supported by the proof and need not be repeated. 298 F.Supp. 213, 216–219.

The trial judge recognized that:

"A neighborhood is not an abstract concept but is dependent for its content upon the social and economic components which make up the neighborhood.

* * * * * *

"Regarding the needs of all children of Norwalk as paramount in the selection of a site for a school, the Board,

in good faith and without improper racial motivation or arbitrary disregard of the rights of a minority, concluded that educational facilities should not be maintained and constructed in plaintiffs' neighborhoods" (p. 222).

\* \* \* \* \* \*

"Although *people* are equal and governmental classification by race will not be tolerated, *neighborhoods* are not. Reasonable administrative discrimination between neighborhoods in determining the location of public facilities such as schools is not subject to judicial intervention where those facilities remain available for use by all—particularly, as here, absent proof that such use is adversely affected by any required transportation. This Court will not intervene and strike down discretionary decisions of the administrative and legislative branches of government, so long as those decisions do not transgress the mandate of the Constitution" (p. 223).

In conclusion the Court said:

"Norwalk voluntarily has integrated its elementary school system by a plan which has eliminated the neighborhood school in underprivileged minority areas. Both the integration and the elimination have been undertaken with the same goal: the attainment of quality education for all children of Norwalk. Since the Board's action clearly was within the scope of the law, protests by certain segments of the Norwalk community are misplaced in seeking relief in the judicial arena. For this Court to intervene in a case such as this would be to discourage voluntary action by enlightened public officials attempting to correct one of the underlying causes of racial tension in this Nation" (p. 226).

Plaintiffs would eliminate what they call unequal treatment by having, in effect, one white child bussed out of his neighborhood for every black child bussed out of his—in other words, deprive as many whites of neighborhood advantages as black are deprived by being bussed to schools predominantly white. But the problem is not as simple as a one black, one white ratio. It is a question of the Board, with the facilities available having "acted in the utmost good faith, in a nonarbitrary and deliberate manner, in order both to insure racial balance and to provide high quality education" (Finding No. 22). This finding is definitely not clearly erroneous and is basic to a just resolution of the merits of this case.

Judgment affirmed.

IRVING R. KAUFMAN, Circuit Judge (dissenting).

I share the majority's empathy for the Norwalk Board of Education's efforts to integrate its schools in a voluntary manner, without the threat of court action. They are to be commended, rather than condemned, for taking a step that many similarly situated communities resist up to the last court order. Under these circumstances I, like the majority, would give the Board wide latitude in setting up a workable plan, one that would accommodate the varying interests both between and within[1] the communities involved. I would, however, remand this proceeding to the district court with directions to remand to the school board, for I believe that both the court and the board have permitted a perhaps otherwise reasonable conclusion to be infected by consideration of a constitutionally impermissible factor.

The district court relied on distinguishing between "neighborhood" rather

---

1. Rendering the board's task doubly difficult in this instance is the presence—hardly unique to Norwalk—of a deep division within the Black and Puerto Rican community over not only the means, but even the ends of public education. On one side are the plaintiffs, who would prefer neighborhood schools, apparently even if they are almost entirely Black and Puerto Rican; on the other, those who attempted to intervene on the side of the board, supporting bussing of Black and Puerto Rican children to white neighborhood schools to promote integration. See Norwalk Core, etc., et al. v. Norwalk Board of Education, 298 F.Supp. 208 (1968).

than racial lines in upholding the board's action in deciding which schools should be closed, which students bussed, and which areas selected for new schools. Yet when the Ely school, a relatively modern facility located in a predominantly Black and Puerto Rican neighborhood, physically suitable for continued use, was closed, the only students bussed were Black and Puerto Rican. The white children who had been attending Ely were permitted to attend other schools within walking distance. Indeed, since one of the avowed aims of the Policy 5122a was to promote integration, it is difficult to see how racial considerations—wholly apart from "neighborhood" conditions—could have been avoided.[2] I am compelled to conclude, therefore, that decisions on school location and bussing were based in part on racial considerations, and operated in practice as racial classifications.[3]

It is well settled that racial classifications must be scrutinized carefully, and that they must bear "a far heavier burden of justification" than other similar classifications. See Hunter v. Erickson, 393 U.S. 385, 392, 89 S.Ct. 557, 21 L. Ed.2d 616 (1969); Loving v. Virginia, 388 U.S. 1, 10, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1968); Bolling v. Sharpe, 347 U. S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1964). The majority would meet that burden by pointing to the board's considered conclusion that overall educational opportunities for all Norwalk children would be improved by closing schools in what were euphemistically described as "underprivileged neighborhoods," and by transferring students from those neighborhoods to schools where a more effective educational environment could be maintained. On the face of it, the justification is not without merit. We must be ever mindful of Justice Brandeis's remark that "It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 (1932) (dissenting opinion). We do not compel all communities to follow the same route to effective education; we should rather encourage different solutions in the hope that one of these "laboratories" will show the way to the rest.

Yet we cannot abandon the limits the constitution places on experimentation. We must not forget that the broad discretion given local governments is tempered by the constitutional mandate requiring that these experiments not favor one racial group at the expense of others. We must consider not only the end sought and the means chosen, but the processes employed to select those means. The board, I am willing to agree, should be upheld if, on the basis of competent evidence it reached a decision on educational policy that was not unreasonable in the light of its wholly laudatory desire to provide high calibre education for all Norwalk students.

In my view, however, that has not been done. One important factor the board relied upon in deciding whether or not white children would be bussed into schools in predominantly Black or Puerto Rican neighborhoods was "the existence of racial hostilities and fears." 298 F.Supp. at 218. Control of "race

---

2. The statistics, while not conclusive, are compelling. Of 1581 Black and Puerto Rican school children, 49% or 775 are bussed; of 7934 whites, less than ½ of 1% (39 students) are bussed. See 298 F.Supp. at 216. And those 39 appear to have been bussed for reasons unrelated to integration. See 298 F.Supp. at 217.

3. One school board expert testified that students were chosen for bussing from both the Ely and Columbus schools "solely because they were Negroes and Puerto Ricans." The district court found the burdens of bussing rested primarily on Blacks and Puerto Ricans, 298 F.Supp. at 216, and while speaking of neighborhood considerations, tested the school board's actions with the standard applicable to racial classifications. 298 F.Supp. at 223, 226.

hostility," the Supreme Court recognized as long ago as 1917 "cannot be promoted by depriving citizens of their constitutional rights and privileges." Buchanan v. Warley, 245 U.S. 60, 80–81, 38 S.Ct. 16, 20, 62 L.Ed. 149 (1917). It is no answer to state that there is no "right" to neighborhood schools, or to end *de facto* segregation.[4] It has long been settled that even when the government is conferring benefits or privileges it must make them available to all in a manner that does not discriminate on the basis of race. See, e.g., Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Watson v. City of Memphis, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963); Wright v. Georgia, 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963). See also Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1420, 1454–57 (1968). Specific applications of the *Buchanan* principle have made it perfectly clear that mere racial hostility cannot serve as an adequate basis for denying equal treatment in the use of public facilities. See, e.g., Taylor v. Louisiana, 370 U.S. 154, 82 S.Ct. 1188, 8 L.Ed.2d 395 (1962) (segregated waiting room) (per curiam).[5]

By considering racial hostility as a reason for refusing to bus white children to black schools, the board in effect not only recognizes the existence of racial fears and distrust, but possibly caters to them. Its own Policy 5122a calls for integration as a means of promoting "mutual respect"; yet it works at cross purposes by recognizing and in effect legitimizing the very racial misunderstandings it seeks to eradicate. Valid

distinctions may be raised to govern distribution of educational benefits, but those distinctions may not be based on race if a reason for making them is in part to yield to racial hostilities. For example, let us assume that a benefit, state scholarships, are conferred on a merit basis to a disproportionately large number of Chinese. Let us assume that this contributed to hostility against Chinese in state institutions. May the state, in the interest of quieting these racial antagonisms, limit the number of otherwise qualified Chinese given scholarships? Or, in the interest of maintaining tranquil waiting rooms, may Louisiana at this late date segregate white and Black passengers? I think the answer in both cases must be no. See Taylor v. Louisiana, 370 U.S. 154, 82 S.Ct. 1188 (1962).

We cannot permit the board's order to stand "unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." SEC v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) (Frankfurter, J.). Since racial hostilities were admittedly a factor in the school board's decision to close the Ely school, and to institute one-way bussing, I would remand to the board to reconsider without placing "racial hostilities" in the balance. This fully accords with the principle that "[w]here the agency has rested decision on an unsustainable reason, the court should generally reverse and remand even though it discerns a possibility, even a strong one, that by another course of reasoning the agency might come to the same result." Friendly,

4. This Circuit has not decided whether there is a constitutional compulsion and therefore a "right" to end de facto segregation. See Offerman v. Nitkowski, 378 F.2d 22 (2d Cir. 1967). Cf. Taylor v. Board of Education of City School Dist. of City of New Rochelle, 294 F.2d 36, 39 n. 2, cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961).

5. A similar doctrine is applied in the free speech area. There the rule is also considered well settled that fear of hostile reaction to the speaker's message is an insufficient reason to limit his right to speak. See Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1960); Gregory v. City of Chicago, 394 U.S. 111, 117, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969).

Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 Duke L.J. 199, 222. How much more so when we are under constitutional compulsion to scrutinize racial distinctions carefully, and apply a "heavier burden" to justifications for them. See Loving v. Virginia, 388 U.S. 1, 10, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1968).

We have already shown our awareness of the hardships and disadvantages of contrived neighborhood lines, see Taylor v. Board of Education of City School Dist. of City of New Rochelle, 294 F.2d 36, 39 n. 2, cert. denied, 368 U.S. 940, 82 S.Ct. 382 (1961); contrived bussing and cross-bussing may pose similar problems. But we do not reach those questions on this appeal. As I have indicated, I would permit the board rather wide latitude in fashioning a workable plan to implement its worthy objectives—all I am saying is that it ought to rely on constitutionally permissible considerations in reaching its decision.