**Robert GOMPERTS et al., Plaintiffs,**

v.

**Charles E. CHASE et al., Defendants.**

**No. C–71 1307.**

United States District Court,
N. D. California.

July 19, 1971.

Sidney L. Berlin, Fred R. Brinkop, James Madison, Phrasel Shelton & Associates, Redwood City, Cal., for plaintiffs.

Francis J. Stillman, Dennis Hession, Hession, Creedon, Hamlin, Kelly, Hanson & Farbstein, San Mateo, Cal., for defendants.

## OPINION AND ORDER

SCHNACKE, District Judge.

Plaintiffs, representing classes of students, residents, taxpayers, parents and others concerned, have brought this action under Section 1983 of Title 42 U.S. C. for the avowed purpose of remedying the deprivation of rights guaranteed by the Fourteenth Amendment to the Constitution of the United States and Title Six of the Civil Rights Act of 1964.

It is their basic complaint that Sequoia Union High School District of San Mateo County, which operates six high schools, has maintained and is maintaining a system segregated by race, and that the segregation is the product of affirmative actions pursuant to a conscious plan to create and maintain the segregated system.

In the immediate proceeding, plaintiffs seek by preliminary injunction to set aside recent action of the school board modifying a plan adjusting racial imbalance earlier adopted by the board. Entitlement to such relief requires a showing that plaintiffs are likely to prevail on the ultimate trial on the merits, and that the relief is necessary to prevent damage to plaintiffs.

The application for a preliminary injunction has been heard upon affidavits. The basic facts are not seriously in dispute. The schools of the district are clearly racially imbalanced. In October, 1970, Ravenswood High School was 94% black, while four schools had less than 10% black. A higher percentage of minority teachers has been assigned to Ravenswood than to schools with lower percentages of blacks. The four schools with the smallest black enrollment are being operated somewhat above planned

capacity while Ravenswood is below its capacity. Test scores of students assigned to Ravenswood are lower than those of students attending the predominantly white schools in the district.

The school district has, for many years, recognized the racial imbalance. There has been, for several years, a variety of efforts made toward correcting the balance.

Ravenswood High School was only 21% black at the time it was built in 1958. While it is now 94% black, the increased black population of the school has been the product of the racial mix of new residents of the area rather than of any activity by the school board. Quite to the contrary, in the spring of 1963 the school board redrew attendance zones to incorporate into the Ravenswood attendance zone neighborhoods with a high proportion of white residents.

To upgrade the quality of education at Ravenswood High School the board exempted Ravenswood from the district-wide ratios for staff, equipment and supplies, thus providing smaller classroom sizes and more equipment and supplies per pupil at Ravenswood than was available throughout the balance of the district.

Efforts have been made to secure voter approval of bond issues to construct new schools but these efforts have failed.

Over the years the board has permitted a variety of transfers from one attendance district to another in an effort to alleviate the concentration of blacks at Ravenswood; in 1969–70 it encouraged a voluntary plan; and in 1969 it pledged itself to take such steps as are required to improve the educational opportunities for all students at Ravenswood High School.

In June of 1970 a plan was adopted with substantially the following features: a) effective September 7, 1971, minority enrollment at each of the district schools was not to exceed twenty-five percent; the certified staff at each school was to consist of not less than five percent nor more than twenty-five percent minority personnel; and no school plant was to be utilized at more than ten percent in excess of capacity; b) white students were to be encouraged to transfer voluntarily to Ravenswood and Menlo-Atherton, the schools with the highest minority enrollment; the black students were to be encouraged to transfer voluntarily from Ravenswood to other schools in the district; if voluntary transfers did not accomplish compliance with the twenty-five percent guideline students were to be selected on a random basis for mandatory transfer from one school to another; c) certified personnel were also to be encouraged to transfer voluntarily, or were to be involuntarily assigned if voluntary transfers failed to produce compliance with the proposed guidelines.

Between June of 1970 and July of 1971 the composition of the school board changed by virtue of an intervening election. The newly constituted board modified the June 1970 plan by providing that the percentage requirements of the former plan were to be deemed guidelines, that the voluntary transfer option was to be extended, that the ten percent ceiling on overcrowding be eliminated, and that the mandatory transfer aspects of the June 1970 plan be suspended for the school year 1971–72 to permit the board to consider viable alternatives to mandatory transfer.

In July of 1971 the board reaffirmed the previously announced program to establish at Ravenswood "an administration and faculty committed to creating excellence in education through the development of special programs and better teaching techniques" and to establish other programs to create what was termed a "New School."

The modification of the June 1970 plan approved in July of 1971 in effect requires the board to follow and implement the June 1970 plan, except as modified.

If the plan, as modified, is carried out, the black population of Ravenswood

will initially be reduced from 94% to about 45%.

■ In order to find jurisdiction sufficient to warrant the interference by this Court with the activities of a duly elected school board, it is first necessary that the plaintiffs establish not only that there is racial imbalance as between the schools of the district, but also that such segregation has been planned, encouraged, fostered, designed, or in some way created by law or by administrative action under the color of law. Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954), teaches that when a state segregates children in public schools solely on the basis of race, the Fourteenth Amendment rights of the segregated children are violated. This falls far short, however, of prohibiting the maintenance of racially imbalanced schools, as the product of neighborhood mix or otherwise, where that imbalance exists under laws or school board activity which is racially neutral. Deal v. Cincinnati Board of Education, 369 F.2d 55 (1st Cir., 1965); Bell v. School City of Gary, Indiana, 324 F.2d 209 (7th Cir., 1963), certiorari denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964).

■ In effect then, and in the shorthand that has developed in these cases, we are required to find, before we may assume jurisdiction, that there has been *de jure* segregation.

Plaintiffs place heavy if not entire reliance upon Keyes v. School District #1, Denver, Colorado, 10th Cir., 445 F.2d 990, decided June 11, 1971, modifying and affirming the decree of the District Court reported at 313 F.Supp. 61 (D. Colo.1970) and 313 F.Supp. 90 (D.Colo. 1970) which superficially appears to have a number of similarities to the present case.

*Keyes* actually stands on substantially different grounds. There, for example, the black school complained of was initially planned for a district whose boundaries coincided almost precisely with certain of the boundaries of the black residential district; when it opened its racial composition was 89.6% black. The trial court there found that "the positive acts of the Board in establishing [the black school] and defining its boundaries were the proximate cause of the segregated condition which has existed in that school since its creation * * *" The fact here is completely different. The black population was about 21% when the new Ravenswood School was opened; the racial imbalance has been created by an influx of black population displacing whites who previously lived in the area and the children who attended the school.

The Tenth Circuit, in modifying and affirming the judgment of the District Court on the merits, specifically refrained from finding that the rescission of a plan adopted by a prior board was of itself an act of *de jure* segregation. This casts some doubt on the propriety of the preliminary injunction issued in *Keyes*.

Plaintiffs argue that the modification by the present board of the plans embodied in the prior resolutions constituted *de jure* segregation within the holding in Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). This assumes, without justification, that the situation resulting from the modification made by the latest resolution was motivated by segregationist intent. In *Reitman*, the Court, in reviewing the adoption of Article I, § 26, of the California Constitution by initiative, examined its " 'immediate objective,' its 'ultimate effect' and its 'historical context and the conditions existing prior to its enactment.' " 387 U.S. at p. 373, 87 S. Ct. at p. 1630. Here, the objective, effect and context of and the conditions pre-existing the latest action of the board demonstrate only a disagreement with certain aspects of corrective measures previously adopted and a desire to try out different methods to the same end. We are unable to find, on the present record, that the modification

was made in bad faith, or was motivated by an attachment to segregationist principles.

■ *Keyes* recognizes that neighborhood school plans, when impartially maintained and administered, do not violate constitutional rights even though the result of such plans is racial imbalance. United States v. Board of Education of Tulsa County, 429 F.2d 1253 (10th Cir., 1970); Board of Education of Oklahoma City v. Dowell, 375 F.2d 158 (10th Cir., 1967); Downs v. Board of Education of Kansas City, 336 F.2d 988 (10th Cir., 1964). It is only when a board of education embarks on a course which is motivated by purposeful desire to perpetuate and maintain racially segregated schools that the constitutional rights of those affected have been violated.

The trial court in *Keyes* refused to find that schools in what were referred to as "core" areas had been segregated by state action and the Court of Appeals refused to disturb the finding, holding that plaintiffs had failed in their burden of proving by a preponderance of the evidence that racial imbalance existed *and* was caused by intentional state action. It similarly approved the trial court's finding that there was no inappropriate state action or segregative desire in locating minority teachers in schools with predominantly minority pupils, pointing out that, while questioned by some, there is a rational theory that black pupils relate more thoroughly to black teachers, that the image of the successful, well-educated black at the head of a class provides the best kind of motivation for children, and that the black teacher has greater understanding of the black pupils' educational and social problems.

The most that can be said for plaintiffs' showing is that the district has not moved as rapidly and effectively to adjust racial imbalance as plaintiffs would like. This, however, involves no constitutional deprivation. If school boards are permitted, as they are, to do nothing to cure racial imbalance which is the product of a neighborhood plan impartially administered, it would be self defeating to hold that the Fourteenth Amendment forbids such a board taking some curative action. If neutrality is not unconstitutional, certainly action designed to cure undesirable imbalance is not, even though it may fall short of its goal.

On this record the Court cannot find that there is a strong likelihood that plaintiffs will prevail on the merits in this action. Nor can it be found, on balance, that any harm resulting from the denial of the preliminary injunction sought would be greater than the harm done the district by interfering with its implementation of what may be demonstrated to be a sound and effective plan. Accordingly, the preliminary injunction is denied.

The foregoing shall constitute the Court's findings of fact and conclusions of law herein.