Clinton STANTON, Sr. and Beverly A. Stanton on their own behalf and as Guardians ad litem for Pamela Stanton, et al., Plaintiffs,

v.

The SEQUOIA UNION HIGH SCHOOL DISTRICT et al., Defendants.

No. C–75–2687 SC.

United States District Court,
N. D. California.

Feb. 10, 1976.

Spaeth, Blase, Valentine & Klein, Palo Alto, Cal., for plaintiffs.

Keith C. Sorenson, Dist. Atty., George F. Camerlengo, Deputy Dist. Atty., San Mateo County, Redwood City, Cal., for defendants.

## MEMORANDUM OF DECISION

CONTI, District Judge.

We are asked to consider whether a school board's decision to close the only high school in a predominantly black neighborhood violates the equal protection guarantees of the Fourteenth Amendment. The request is brought on behalf of classes of students, parents, residents and concerned others [1] under § 1983 of Title 42 U.S.C. and Title VI of the Civil Rights Act of 1964. We have jurisdiction under 28 U.S.C. § 1343(3), this being an action for an injunction redressing constitutional and statutory rights. The high school district, acting through the members of its board of trustees, and the parent county board of education are alleged to have adopted and begun to implement a constitutionally impermissible school desegregation plan which puts the burden of that otherwise commendable goal entirely upon black students and their parents.

The target of this plan is Ravenswood High School in East Palo Alto, a predominantly black community which lies at the northeastern-most extremity of the Sequoia Union High School District in San Mateo County. The district, which is roughly in the shape of an elongated horseshoe, extends west and northwest, encompassing the cities of Menlo Park, Atherton, Redwood City, Woodside, San Carlos, and Belmont, in addition to East Palo Alto, in an area of approximately 100 square miles. Within this area are presently six high schools—Ravenswood, Menlo-Atherton, Woodside, Sequoia, San Carlos, and Carlmont. Carlmont High School is at the western tip of the horseshoe and Ravenswood is at the eastern tip, separated by a distance of some 10 to 12 miles. The Bayshore Freeway, which cuts across the top of the horseshoe, separates from the remainder of the school district most of East Palo Alto, as well as the predominantly white community of Redwood Shores.[2]

Under the plan, students living within the present Ravenswood attendance area, most of whom are black, are to be

1. Plaintiffs bring this action under Rule 23(b)(2) (solely to enjoin defendants' actions affecting the entire class). Because of our disposition of the case, we do not reach the issues of class certification, the applicability of Rule 23(b)(2), or the required notice to class members.

2. A map of the school district, showing the locations of the district's six high schools, is attached to this opinion as Appendix I.

bussed across the freeway to one of the other five high schools. It is the deprivation of their neighborhood school and the "one-way busing" they must abide of which plaintiffs complain. In point of fact, the district has reassigned the present Ravenswood attendance area students to high schools only one of which is the next nearest school, this according to the Board being done to achieve racial balance throughout the district. Plaintiffs allege that the plan operates to deprive only black students, not white students, of their neighborhood schools, in violation of the former's constitutional rights.

This court on December 17, 1975, upon the District's assurance that it would suspend any negotiations in which it was engaging to sell or lease the Ravenswood property, denied plaintiffs' request for a temporary restraining order which would have gone somewhat further in not only blocking the negotiations, but also halting the District's administrative planning in furtherance of the closure decision, including paper relocation of school equipment and facilities and student and teacher reassignments, the latter being, in plaintiffs' contemplation, detrimental to the morale of Ravenswood students attending during the present 1975–76 school year. A full hearing on the matter was had in this court on January 27, 1976. Defendants at that time agreed not to resume sale or lease negotiations until a final decision was forthcoming from this court.

■ Before going further into the factual background of this case, we shall state at the outset what we believe to be the legal issue presented, as well as what

we believe *not* to be the issue. Under the governing legal principles, we are *not* here to decide whether the school board adopted the best solution to the problems confronting it of lowered enrollment, increased costs in the face of diminishing revenues, and the desirability of integration in the operation of the Sequoia Union High School District's six high schools. The mechanics of running a school system are solely within the power, authority, and prerogative of the duly elected school board, so long as the board performs its duty without running afoul of the constraints imposed by the Constitution. This court should not and will not inject its own opinion or ideas as to which is the best system or plan or what it thinks is a better plan. We judge only whether the board's plan as adopted operates constitutionally. In the context of this case, we decide only whether the Board's plan to close Ravenswood is within constitutional restraints.

### Factual Background of the Board's Action

In 1950, with a total enrollment of 2,950 students, the District operated one high school, Sequoia.[3] The five present additional high schools were constructed as district enrollment figures climbed to a peak in 1969–70 of 12,379 students.[4] Since that time enrollment has been on the decline, to the point that by the fall of 1975, the district total was down from peak figures more than 1,500 students to 10,827. Furthermore, enrollment projections indicate a total enrollment in the 1982–83 school year of 8,223, or a 34% decrease from peak enrollment.[5]

3. See Sequoia Union High School District Report on School Closure, August 19, 1975, in evidence at the hearing as Plaintiffs Exhibit 2 (also attached as Exhibit 1 to Affidavit of Marion McDowell, Administrative Assistant to the Superintendent and Chairperson of the Report Committee) [hereinafter School Closure Report], Appendix D. p. 5D.

4. School Closure Report, Appendix D, p. 5D.

5. These enrollment projections are based on the actual drop in enrollments in the elementa-

ry "feeder" schools in the district. See School Closure Report, Appendix A, p. 2A, which compares district total projected enrollments for each school year through 1982–83 with total school capacity, assuming alternatively that (1) Carlmont or Sequoia are closed now, (2) Menlo-Atherton, Woodside, or San Carlos are closed now, and (3) Ravenswood is closed now. The enrollment/capacity differentials (columns 4, 7, & 9) show that capacity overages if Ravenswood is closed are significantly smaller than the corresponding figures if one

When these actual enrollment figures were compared with the total capacities of the six district high schools, 11,937,[6] the District began to consider closing one or more of the schools. To make matters worse, the District is now facing serious financial difficulties. Projections show that the present level of expenditures will exceed income in 1976–77 by approximately $1.4 million.[7] The major source of revenue for school districts is local taxes. However, this source of revenue is limited by sections 2201 *et seq.* of the California Revenue and Taxation Code which in substance places a ceiling on the amount of revenues obtainable without voter approval. In two revenue limit increase elections called by the District in November, 1974 and March, 1975, the voters failed to approve an increase in the revenue limit.[8] Faced with the need to balance the district's budget, the Board in March, 1975 took action to cut more than $2 million from the district budget and authorized the elimination of more than 100 employee positions.[9]

This adverse financial picture coupled with declining enrollment dictated that the possibility of closing a school be studied. In January, 1975 District Superintendent Chaffey appointed a committee to study and make a recommendation on school closure.[10] The methods used by the task force in arriving at its conclusions included: (1) Developing criteria for selecting the school to be closed (including adequacy of the facility, enrollment factors, location, cost savings, resulting transportation costs, maintenance of educational programs, community relationships (including the need for integration), and disposition of property)[11]; (2) gathering information on these criteria; (3) conducting surveys of community desires of parents, students, and staff; and (4) studying the feasibility of keeping all six schools open and saving money through other means. See Sequoia Union High School District Report on School Closure, August 19, 1975 [hereinafter School Closure Report] p. 2, Exhibit 1 to Affidavit of Marion

---

of the other, larger high schools is closed. This factor was taken into account by the closure committee in recommending Ravenswood over another school for closure.

In addition, attendance area projected enrollment loss rate figures (derivable from actual enrollment figures for school year 1975–76 and projected enrollments for 1982–83, see School Closure Report, Appendix D, p. 16D, by subtracting the latter from the former and dividing the result by the former), show that loss rates are greatest in the central and southeastern part of the district, ranging from 23% for the Menlo-Atherton area to 31% for the Sequoia area. The Ravenswood area is expected to experience a 24% enrollment decline in this time period. Significantly lower, however, is the Carlmont area's loss rate—15%—which, in the closure committee's view, made Carlmont less suitable for possible closure at this time than another school. See School Closure Report, p. 7. This consideration is especially relevant in light of plaintiffs' primary concentration at the hearing on closing Carlmont as an alternative to the Board's closure plan.

**6.** The "rated" student capacity of each high school, based on such considerations as number of classrooms, availability of facilities (such as laboratories, craft shops, gymnasiums, etc.), and number of class periods per day, is presented below:

| Carlmont | 2,224 |
|---|---|
| Sequoia | 2,224 |
| Woodside | 1,983 |
| Menlo-Atherton | 1,977 |
| San Carlos | 1,946 |
| Ravenswood | 1,583 |
| Total | 11,937 |

See School Closure Report, Appendix D, p. 7D. School capacity can be increased somewhat by the use of "relocatable classrooms", depending on site availability, as was done in enrollment emergency periods prior to 1970 when new high schools were under construction.

**7.** School Closure Report, p. 9.

**8.** See Affidavit of George Chaffey, Superintendent of the Sequoia Union High School District [hereinafter Chaffey Affidavit], p. 2.

**9.** Chaffey Affidavit, p. 3.

**10.** The six-member committee consisted of Marion McDowell, Administrative Assistant to the Superintendent; John Gomez, Director of Human Relations; James Van, Principal of Ravenswood High School; Mal Taylor, Vice-Principal of Woodside High School; David Tansey, Assistant Superintendent; and Allan Grumen, Director of Research and Data Processing for the District.

**11.** See School Closure Report, Appendix A, p. 4A.

McDowell, Administrative Assistant to the Superintendent and Chairperson of the Report Committee.

The report indicated that the most important criteria were the maintenance of existing educational programs and services and the amount of operating cost savings.[12] The closure committee also investigated alternatives to closing a school which would allow a balanced budget. These included sale of unused district property and equipment, increased funds from summer programs, a voter-approved revenue limit increase, and federal funds.[13] The committee determined that these alternatives would be insufficient to solve the financial problem and that were all six high schools to be left open, "major cuts" in the entire educational program in the district would be necessary. The committee's final recommendation, therefore, opted for school closure over debilitating across-the-board program slashes. The committee evaluated the impact on finances and education by simulating the closing of one school at a time, leaving the remaining five open, and concluded that Ravenswood should be closed effective July 1, 1976, with a second closure, probably of Carlmont, to take place not later than 1981. The Board of Trustees adopted these recommendations.

### The Decision to Close Ravenswood

The task force's targeting of Ravenswood for first closure was based on the following application of the accumulated data to the evaluation criteria listed above:

(1) While the Ravenswood facilities are new—in fact, next to the newest of the district schools—and the operating and maintenance costs are the lowest of the six schools (reflecting the small size of the plant and the school's low enrollment), the cost for building renovation, repair and replacement, were the school to remain open, would be the second highest of the six schools, at $488,125.[14]

(2) While student population living in the Ravenswood attendance area is approximately 1,350 for 1975–76, only about 450 students from the area are actually enrolled at Ravenswood, with total school attendance of about 690 students, or about 43% of the school's rated capacity.[15] This is far less, in the committee's view, than "efficient enrollment levels" would dictate. Additionally, closure of a larger high school, such as Carlmont, would reduce total district school capacity to about 9,700 students, or over 900 students less than the 1976–77 projected total district enrollment of 10,623 students. Thus the district, without Carlmont, would be required to operate beyond rated capacity to the extent of some 900 students, or more than 180 students on the average per remaining school. Closure of the smaller Ravenswood, however, would result in a diminution of total capacity of 1,583, to 10,354, which translates into a 1976–77 capacity overage of only 270, or 54 students on the average per remaining school. The

---

12. See School Closure Report, p. 4. Another important factor in the closure analyses was the likelihood of the closed facility's being put to educational use following the closure. With regard to Ravenswood, the committee recommended that the facility be leased to the San Mateo Community College District which had earlier expressed an interest in using the building. See School Closure Report, p. 20.

13. School Closure Report, p. 9 and Appendix F, pp. 2F–7F.

14. School Closure Report, p. 5, Appendix A, p. 9A, and Appendix D, pp. 10D–11D. The school with the highest renovation and repair costs—Sequoia, at $647,400—has a rated capacity in excess of that of Ravenswood by some 640 students, which in part explains the cost difference. In part because Sequoia High School has extensive facilities for sports activities, and is the only district high school with special occupational and vocational shop facilities, see School Closure Report, Appendix A, p. 7A, the committee felt it would be disadvantageous to the district system as a whole to close Sequoia. See School Closure Report, Appendix A, p. 18A.

15. The 900 Ravenswood attendance area students not accounted for in these figures have opted during the present school year to attend other high schools out of the Ravenswood area on a purely voluntary basis. See discussion infra.

committee viewed this overage figure as more acceptable than that caused by closing a larger school.

(3) The number of students to be reassigned, after the closing of Ravenswood, would be materially less than the number of students that would have to be reassigned through the closing of any of the other high schools.[16] If Ravenswood were to remain open *as a racially balanced high school,* the number of Ravenswood attendance area students that would have to attend away from the Ravenswood attendance area would be approximately the same number as are now attending the other schools on a voluntary basis.[17] This is so because of the peculiar ethnic population distribution in the district, with over 70% of the minority students in the district living in the Ravenswood attendance area. Keeping Ravenswood open and racially balanced with a 75%–25% majority to minority split at each school, only 25% or 325 of the black students living in the Ravenswood area could attend Ravenswood; 75% or 825 would have to be bussed elsewhere. There are currently in the 1975–76 school year some 900 Ravenswood area students attending one of the district's five other high schools on a purely voluntary basis.

(4) Net savings by closing Ravenswood are projected to be approximately $8.6 million over a 10-year period.[18] This is the highest savings figure to be achieved by closing any of the six high schools, but it is not significantly higher than that which would be reached by closing Carlmont or Menlo-Atherton.[19] This fig-

16. For example, at the hearing, defendants countered plaintiffs' suggestion that a better alternative would be the closure of Carlmont, with figures from a district study showing that total district reassignments necessitated by closing Carlmont would be more than three times the corresponding figure for closing Ravenswood. See Sequoia Union High School District Reassignment Comparison Report, January 23, 1976, Defendants Exhibit 1 in evidence at the hearing.

Defendants reported that the closure of Carlmont, one of the two largest high schools in the district with a rated capacity of 2,224 and projected 1976–77 enrollment very close to that figure, would require nearly 4,000 total reassignments as attendance area boundaries of each of the five remaining high schools would have to be shifted progressively to the northwest, and as special out-of-area reassignments would have to be made in order to achieve racial balance. Closure of Ravenswood, on the other hand, will result in just over 1,200 such reassignments. The significant difference in terms of total number of students impacted weighed heavily in the committee's assessment of which school to close.

As far as total impact on students is concerned, the committee seems to have been influenced by the following facts which tended to point toward closure of Ravenswood: (1) Ravenswood has the smallest rated capacity of all district high schools; (2) actual enrollment figures for school years 1966–67 through 1975–76 and projected enrollment figures for school years 1976–77 through 1982–83 show the Ravenswood attendance area to have the smallest enrollment of any of the district attendance areas, see School Closure Report, Appendix D, p. 16D; and (3) of those roughly 1,300 students presently living within the Ravenswood attendance area, two-thirds are not in fact attending Ravenswood in the 1975–76 school year, but rather have voluntarily chosen another high school under the district's voluntary transfer plan. The impact of closing Ravenswood is, therefore, in rough terms limited to those 690 students attending Ravenswood, 240 of which live outside the area and are attending Ravenswood on a voluntary transfer basis. This leaves roughly 450 students directly impacted by the closure plan in the sense that they will be required to attend a high school they might not otherwise have chosen. The committee and the Board felt that, given the exigency of closing a high school, closing Ravenswood would hold total disruption of education in the district to a minimum.

17. That is to say, roughly the same number of students, 900, as are now busing out of their Ravenswood residence area to other high schools voluntarily, would be required under the racial balance plan to which the district is now committed (see text accompanying note 30 & note 30, *infra*) to attend out of the Ravenswood area, and some 1,200 non-minority students from other attendance areas would be required to bus in to Ravenswood.

18. See School Closure Report, Appendix E, p. 1E.

19. Ten-year net savings figures are as follows:

| | |
|---|---|
| Ravenswood | $8,635,903 |
| Carlmont | $8,582,718 |
| Menlo-Atherton | $8,356,652 |
| Sequoia | $8,314,331 |
| Woodside | $7,768,670 |
| San Carlos | $7,537,127 |

ure, however, represents a per-pupil savings in excess of three times that to be achieved by closing any of the other high schools.[20]

(5) *Additional* transportation costs, due to the closing of Ravenswood, would be significantly less than those which would be incurred by closing a larger high school, such as Carlmont.[21]

(6) There are no educational programs which require facilities unique to the Ravenswood physical plant.[22]

(7) The San Mateo Community College District has expressed a strong interest in converting the Ravenswood property to use for academic and vocational classes, thus keeping the facility in use for educational purposes.[23]

(8) The committee also considered the fact that the truancy rate at Ravenswood was double that of the other schools, and took notice of the "cycle of low achievement" of a majority of the Ravenswood students entering the Sequoia District from the Ravenswood Elementary District, which continued through the high school years. Students entering Ravenswood possess reading and math skills 2½ to 3 years below grade level on the average to begin with; and the median gain scores while at Ravenswood are the lowest of all district high schools (.1 of a grade for math, .5 of a grade for reading, as compared with the overall district median of .6 and 1.1 respectively).[24] From these

See School Closure Report, Appendix E, p. 1E. There is an additional consideration, relied upon in making the closure decision, which does not appear from the absolute cost figures above: in terms of school operating *efficiency,* taken as a function of the size of the facility measured by rated capacity, there is apparently some reason to believe that the optimum point is reached with a student enrollment around 2,000. See Sequoia Union High School District Report, Compelling Reasons for Closing Ravenswood, September 17, 1975, contained in Plaintiffs Exhibit 1 in evidence at the hearing [hereinafter Blue Book] at pp. 53–79 (also attached as Exhibit 3 to Chaffey Affidavit) at pp. 3–4 of the Report. Ravenswood is the only high school in the district with a rated capacity considerably below this figure (1,583). See note 6, *supra.*

20. It should be remembered, however, that this per-pupil savings differential is as large as it is because only 690 students are presently attending Ravenswood. The low enrollment is because two-thirds of the Ravenswood attendance area students have opted to attend elsewhere under the District's voluntary transfer plan, and the school has received only 240 reciprocal transfers. It would be more meaningful to measure the per-pupil savings differential on the basis of *full* enrollment at Ravenswood (which would be the case were another high school to be closed), in which case the per-pupil savings by closing Ravenswood is roughly 1.5 times that resulting from another closure.

21. The District compared additional transportation costs to be incurred by alternatively closing Carlmont, Menlo-Atherton, and Ravenswood. It was found that closing Carlmont would increase annual transportation costs by

$24,744.00 (due to the large size of the facility and the extensive reassignments necessary); closing Menlo-Atherton would increase such costs by $20,546.00. It was found, however, that closing Ravenswood would result in an annual *savings* of $8,212.80. See Report, Compelling Reasons for Closing Ravenswood, pp. 24–26; Blue Book pp. 77–79. Transportation savings accruing from Ravenswood's closure are due to the facts that (1) two-thirds of the attendance area students are already using district-provided transportation to attend high schools outside of the Ravenswood area and thus would not contribute to a cost increase, and (2) costs now incurred to bus nonminority students into Ravenswood, to the extent of some $47,421.84 annually, would be eliminated, these students returning to their regular attendance area schools.

22. Contrast the situation at Sequoia High School, which has special facilities for laboratories, shops, and sports activities. See School Closure Report, Appendix A, p. 18A.

23. See School Closure Report, p. 6; Letter of October 9, 1975 from Chancellor-Superintendent Smith of San Mateo Community College District to Superintendent Chaffey, Exhibit A to Affidavit of W. James Ware in Support of Plaintiffs' Motion for Temporary Restraining Order.

24. See Report, Compelling Reasons for Closing Ravenswood, pp. 6–7 (Blue Book, pp. 59–60); and School Closure Report, p. 11. The students' deficiencies upon entering Ravenswood are, of course, not due to that institution, but the continuation of those deficiencies through the high school years and the lack of meaningful gain (significantly below the district aver-

data, the committee concluded that the apparently better educational environment found at the district's other schools might assist in breaking this cycle.

### Steps Toward Integration

While this complaint does not allege that defendants are maintaining an unconstitutional racially imbalanced school system, but rather objects that defendants seek to achieve racial balance under the closure and reassignment plan by unconstitutionally placing the entire burden thereof on plaintiffs and their groups, an understanding of the history of the District's efforts at integrating the high schools is essential for full appreciation of the problems presented in this suit.

Ravenswood High School was only 21% black at the time it was built in 1958. Due to the change in the racial mix of new residents, the percentage of blacks at Ravenswood increased until 1970 when it was 94% black. Prior to 1970, the school board redrew attendance zone lines to incorporate into the Ravenswood attendance area neighborhoods with a high proportion of white residents. To upgrade the quality of education at Ravenswood, the board exempted Ravenswood from the district-wide ratios for staff, equipment and supplies, thus providing smaller classroom sizes and more equipment and supplies per pupil at Ravenswood than were available throughout the other district high schools. Over the years the board has permitted a variety of transfers from one attendance area to another in an effort to encourage integration at Ravenswood on a voluntary basis.[25]

In June, 1970, faced with the serious racial imbalance at Ravenswood, the District adopted a plan whereby voluntary transfers of blacks out of Ravenswood and whites into it was to be encouraged; if racial balance (defined then to be 25% minority enrollment) was not achieved through the voluntary plan, students were to be selected at random for mandatory transfer.[26]

An election held shortly after the adoption of this plan changed the composition of the school board, which, in 1971, as newly constituted, rescinded the mandatory transfer aspects of the 1970 plan. Nevertheless, through a concentrated effort to desegregate undertaken by the school board and the entire community, the initial impact of this 1971 voluntary plan was favorable. The minority enrollment at Ravenswood was reduced to approximately 50%. By the beginning of the 1974–75 school year, however, this figure had climbed to 64.7%.

Following the 1971 modification of the 1970 plan imposing mandatory racial balance, suit was brought against the district in this court. See *Gomperts v. Chase,* 329 F.Supp. 1193 (N.D.Cal.1971). The allegation was that the rescission of the mandatory features of the desegregation plan amounted to *de jure* segregationist action on the Board's part. This challenge was rejected by the court, which noted that *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) required plaintiffs to establish not only racial imbalance in the schools of the district, but also that such segregation "ha[d] been planned, encouraged, fostered, designed, or in some way created by law." *Gomperts,* supra, at 1195. The court noted that *Brown* did not mandate that school boards must take affirmative steps to integrate, so long as any extant racial imbalance existed under school board activity which was racially neutral. *Deal v. Cincinnati Board of Education,* 369 F.2d 55 (1st Cir. 1965); *Bell v. School City of Gary, Indiana,* 324 F.2d 209 (7th Cir. 1963), *cert. denied,* 377 U.S. 924, 84 S.Ct. 1223, 12

age gain scores) was felt to reflect adversely upon the educational environment found there.

**25.** See *Gomperts v. Chase,* 329 F.Supp. 1192, 1194 (N.D.Cal.1971).

**26.** A more complete description of the plan is found in *Gomperts,* supra, 329 F.Supp. at 1195.

L.Ed.2d 216 (1964). Likewise, neighborhood school plans, when impartially maintained and administered, do not violate constitutional rights even though racial imbalance in fact results. The distinction is between *de jure* and *de facto* segregation. See *Keyes v. School District # 1, Denver, Colorado,* 445 F.2d 990 (10th Cir. 1971), *modified and remanded on other grounds,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

The court in *Gomperts* found no bad faith or segregationist motive in the rescission of the 1970 mandatory transfer plan, and the request for injunction seeking to have that plan reinstated was denied.

Meanwhile, the District was experiencing certain difficulties with the federal government. In June of 1970, at a time when the minority enrollment at Ravenswood had reached the all time high of 94%, the Office for Civil Rights (OCR) of the U.S. Department of Health, Education, and Welfare (HEW), notified the District that in OCR's opinion, the District's student assignment patterns were "out of compliance with Title VI of the Civil Rights Act of 1964." [27] On July 12, 1971, following notification that the newly-elected school board had rescinded the mandatory transfer provisions of the 1970 plan to achieve racial balance, and five days after the *Gomperts* case had been filed in this court, OCR communicated to the District that in OCR's view the rescission action constituted a "failure to take the remedial measures required" by the Fourteenth Amendment and Title VI, and that OCR was therefore "required to initiate formal enforcement procedures." [28] In addition, it appears that various District applications to the U.S. Office of Education, HEW for Title IV desegregation grant funds were denied in part because of the District's difficulties in achieving complete racial balance. [29]

Notwithstanding the findings of this court in *Gomperts,* a similar suit challenging the District's assignment policies was brought in state court in 1972. *Sanders v. Trustees, Sequoia Union High School District,* San Mateo County Superior Court No. 166522. Due to lengthy delays, caused by the passage of Proposition 21 and the California Supreme Court's decision in *Santa Barbara School District v. Superior Court,* 13 Cal.3d 315, 118 Cal.Rptr. 637, 530 P.2d 605 (1975), the *Sanders* case was still unresolved in September, 1975. The case was shortly thereafter settled, with court approval of a stipulation which provided for the closing of Ravenswood and mandatory provisions assuring racial balance throughout the District. All schools were to be operated within 5% of rated capacity; and percentage minority enrollment in each of the remaining five high schools was not to deviate by more than 5% from the percentage minority enrollment in the district taken as a whole. [30]

---

**27.** See Letter of January 16, 1976, from OCR/HEW to Superintendent Chaffey, Exhibit 5 to Chaffey Affidavit.

**28.** See Letter of July 12, 1971, from OCR/HEW to Superintendent Chaffey, Blue Book, p. 3.

**29.** See, e. g., correspondence between U.S. Office of Education and Superintendent Chaffey, dated August 18, 1971, September 10, 1971, September 17, 1971, March 20, 1972, March 22, 1972, March 24, 1972, December 24, 1975, and December 30, 1975, Blue Book, pp. 5–39.

**30.** The Stipulation and Order of Superior Court Judge Frank Rose, filed December 11, 1975, provides in pertinent part:

. . . . .

2. That the Court shall enter its order decreeing that the stipulations of the parties hereto shall be the order of this Court in this action.

3. That the Court retain continuing jurisdiction to assure the carrying forward of the stipulations herein for a period of six (6) years from the date of this agreement.

. . . . .

5. That both parties agree that the respondent does not in any manner admit any liability or any illegal actions by entering into this stipulation.

6. That Ravenswood High School, a comprehensive high school within the confines and jurisdiction of the respondent, shall be closed at the end of the 1975–76 school year (unless a court of competent jurisdiction finds the closure to be unlawful under California or Federal Law). Petitioners herein

These capacity and racial balance constraints were satisfactory to the federal government. OCR stated to the District that compliance with the stipulation and order would meet the Title VI requirements.[31]

### The Burden of Desegregation and its Incidence

Plaintiffs complain that the student reassignment plan concomitant upon Ravenswood's closure places the entire burden on black students and their parents. Under the plan, commencing in school year 1976–77, students residing in the present Ravenswood attendance area will be reassigned to one of the District's other high schools. In 1976–77, there will be 1,281 such reassignments. These students are to be distributed among three other high schools as follows: 334 present Ravenswood assignees are to be reassigned to the Woodside High School attendance area; 381 to the San Carlos High School attendance area; 420 to the Carlmont High School area; and 146 to the Menlo-Atherton High School area.[32] By the most direct route, Carlmont and San Carlos High Schools are 9.9 and 10.6 miles from Ravenswood High School; Woodside is approximately 8 miles distant.[33] The District provides free transportation by bus to all students in the district whose residence is in excess of

do not intend to, nor shall they, raise this issue.

7. That the attendance boundaries of the high schools of the district (excluding the continuation high school), commencing July 1, 1976, shall be drawn initially and altered as necessary to provide at all times for enrollments balanced for capacity and for racial and ethnic composition in accordance with the following guidelines:

a. Enrollments for the 1976–77 school year at each school shall not vary more than five percentage (5%) points above or below each school's capacity for said school year. Thereafter, the ratio of enrollment to capacity in future years at each school shall be within five per cent (5%) of the ratio of the district enrollment to district capacity.

b. The minority (black and Spanish surname) enrollments at each school shall not vary more than five percentage (5%) points from the average minority enrollment in the district.

.    .    .    .    .

8. The respondent may, at its option, operate a supplemental open enrollment voluntary transfer plan such as the plan adopted by the Board on October 15, 1975, provided said plan conforms to the guidelines set forth in the preceding paragraph.

.    .    .    .    .

10. The respondent shall maintain a human relations program with the following goals:

a. To continue to develop staff capacity to meet the needs of minority students.

b. To continue to encourage minority students to participate in all aspects of school life.

c. To continue to maintain an educational climate in which students who are achieving below-grade level are encouraged and assisted in improving their performance.

d. To continue to create opportunities among minority students for successful experiences in district schools and for building positive self-images.

e. To continue working to prevent practices, procedures and staff attitudes which result in discrimination against any students because of their race, ethnic background, religion or sex.

f. To continue to create a favorable climate for integration among students, staff, and the community.

11. The district shall employ a staff adequate to carry out the program. The district shall appoint a commission to evaluate the program on an ongoing basis. The composition of the commission shall consist of 8 members, of which at least 50% shall be minority and at least 50% shall be persons *not* employed by the district.

.    .    .    .    .

See Exhibit 4 to Chaffey Affidavit.

Since this court finds the school closure and reassignment plan not to contravene the federal constitution or any statute of the United States, the above Stipulation and Order represents a valid, legally binding commitment undertaken by the District, and, as such, the District is compelled to abide by the racial balance guidelines contained therein.

**31.** See Letter of January 16, 1976, from OCR/HEW to Superintendent Chaffey, Exhibit 5 to Chaffey Affidavit.

**32.** See School Closure Report, Appendix G, p. 1G. This does not mean that those students will necessarily attend the high school to which they are assigned; as long as the racial balance and school capacity constraints of the *Sanders* Stipulation and Order are met, students will be allowed voluntary transfer options to other schools.

**33.** See Appendix I to this opinion.

two and one-half miles from the high school he or she attends (whether a student attends his or her assigned high school, or one chosen under the voluntary transfer plan now in force). In school year 1975–76, approximately one-third of all students in the district (or about 3,500 students) travel to and from high school by bus.

In addition to student reassignments from the Ravenswood area, the closure plan's school capacity and racial balance requirements will necessitate 864 other reassignments in school year 1976–77 as follows: 369 students in the San Carlos area will be reassigned to Sequoia; 211 Carlmont students will go to San Carlos; 188 Woodside students will go to Menlo-Atherton; and 96 Carlmont students will go to Sequoia.[34] San Carlos is approximately 2.5 miles from Sequoia; Carlmont is about a mile from San Carlos and about 4 miles from Sequoia; and Woodside is about 4 miles from Menlo-Atherton.

Although enigmatically no testimony was elicited by either party on this point, the incidence of these non-Ravenswood area reassignments appears from other data in evidence to fall predominantly on white students. It also appears that these reassignments are the consequence of the racial balance guidelines imposed by the closure plan.

For example, the projected black Carlmont attendance area enrollment for 1976–77 is 95 students, not including the reassignments from Ravenswood.[35] Adding the Ravenswood reassignments under the plan (420), the total projected black enrollment at Carlmont in 1976–77 is approximately 500 (assuming the majority of the former Ravenswood area students reassigned to Carlmont are black, a decent assumption since blacks presently comprise 85% of the Ravenswood area students). This figure, 500 students, compares favorably with the District's estimated 1976–77 minority Carlmont enrollment of 490.[36] The inference therefore arises that the 307 reassignments *out* of Carlmont (to San Carlos and Sequoia) are of predominantly white students, and that the reason for these reassignments of white students is so that the 1976–77 minority enrollment at Carlmont can be held within racial balance guidelines, at 22.2%. Likewise, with San Carlos, which under the plan receives 381 former Ravenswood area students, which, totaled with the 1976–77 projected black San Carlos attendance area enrollment of 80, comes to 461 students, comparing favorably with the District's 1976–77 estimated minority enrollment at that school of 450. A similar inference arises that the 369 former San Carlos students reassigned to Sequoia are predominantly white, and that their transfer was necessary to hold the San Carlos percentage minority enrollment within plan limits, at 22.1%. A similar analysis can be made of the Woodside transfers to Menlo-Atherton.

While it is true that the total number of transfers from the Carlmont, San Carlos, and Woodside areas is less than the total number of transfers from the Ravenswood area, and while it is true that the mileages involved in the former transfers are somewhat less than those involved in the latter, from the above data one can conclude at the very least that the burden of desegregation has not been placed *solely* on minority groups. The data presented, however, are not adequate to quantify with exactitude the fraction of the total burden borne by one racial group or another. In this sense there has been a failure of proof by

---

**34.** See School Closure Report, Appendix G, p. 1G. (Note: The table contained on p. 1 of Appendix G contains an apparent typographical error. Under Proposed Change # 8, the 96 Carlmont reassignments are shown as being placed at San Carlos, rather than the correct placement which is Sequoia. I. e., the "+96" should be shifted to the right by one column.)

**35.** See School Closure Report, Appendix D, p. 17D.

**36.** See School Closure Report, Appendix C, p. 1G.

plaintiffs that defendants' actions have imposed the predominant burden of desegregation on black students. We shall, however, for the purposes of this decision, assume that the burden is not equally shared, and that it tends to fall more heavily on blacks than on whites. As will be seen, such assumption in no way changes the result we must reach under the legal principles governing our decision.

We should point out also that since it is fair to say that plaintiffs can legitimately complain only about the *mandatory* transfer aspects of the District's closure and reassignment plan, it is relevant also to consider the fact that approximately two-thirds of the present Ravenswood attendance area students have, for the 1975–76 school year, voluntarily chosen to attend out of their attendance area, traveling to and from their chosen schools by bus.

Furthermore, it appears that some 600 of these students have voluntarily chosen to attend one of the three high schools targeted under the closure plan for the Ravenswood area reassignments. Looking at present voluntary transfer data combined with actual enrollment figures and the racial and ethnic distribution of students by residence, the following appears: (1) Woodside has 5 enrollment area black student residents; 5 black students have transferred out of Woodside; and 256 black students are in attendance at Woodside in 1975–76.[37] It is impossible to say with certainty where these 256 students transferred from, but most likely a sizeable fraction came from Ravenswood; (2) Carlmont has 7 enrollment area black residents; 2 black students have transferred out of Carlmont; and 193 black students are in attendance at Carlmont in 1975–76. Again, it is likely that the majority of the balance of black students, 188 came from the Ravenswood attendance area; (3) San Carlos has 9 enrollment area black student residents; 2 black students have transferred out of San Carlos; and 190 black students are in attendance at San Carlos this school year. Again, most of the 183 transfers in are probably from Ravenswood.[38]

These figures tend to show that significant numbers of black students are already voluntarily attending the three schools to which the closure plan mandates reassignments from the Ravenswood area following that school's closure. As a rough estimate, it appears that of the approximately 1,281 reassignments in 1976–77 necessitated by the closure of Ravenswood, only about 300 students are to be reassigned who are not already voluntarily attending elsewhere. Furthermore, from testimony adduced from District personnel at the hearing, it appears that some 90 openings will be available for black students at Menlo-Atherton and some 50 at Sequoia for attendance on an optional basis. These are the two closest schools to the Ravenswood area and thus could be considered the new "neighborhood schools" of the East Palo Alto area. Thus approximately 160 students, or roughly 2% of the total district enrollment, are to be mandated, under the closure plan, to attend schools which are not the next nearest schools to their residential neighborhoods. This is roughly the magnitude of the transportation burden being imposed upon some members of plaintiffs' group due to the closure of Ravenswood.

■ The court is not oblivious to the fact that the "burden" of relocating students goes beyond mileage and enrollment figures. There are psychological considerations which cannot be and must

---

37. The relevant statistics are found in Sequoia Union High School District Report, Racial and Ethnic Distribution of Students, October 3, 1975, Blue Book, pp. 141–52; and Report, Students on Transfer Status, October 3, 1975, Blue Book, p. 140.

38. It stands to reason that these three schools would have received the largest numbers of black transfer students, given the emphasis of the voluntary transfer plan on attracting minority students to those schools with the smallest minority enrollment. Under the District's closure plan, the present Ravenswood area students are to be assigned primarily to these three schools. See text accompanying note 32, *supra*.

**514**

not be ignored. School authorities are keenly aware of these and have already taken steps to ease the students' transition from Ravenswood to the other schools. For example, James Van, Principal of Ravenswood High School, testified that plans have been formulated to provide academic and social adjustment aid to the Ravenswood students to be reassigned. The plans include evaluation of academic transcripts for possible adjustment due to differences in grading systems at the various high schools, extensive screening of each student's needs and achievements for proper placement of that student in the recipient high school, joint PTA meetings, school visits, assemblies and discussion oriented toward familiarizing students with the school they will be attending, and so on. From all that appears in the evidence, the District is bending over backwards to accommodate students' needs resulting from the necessity of a school closure, and plaintiffs have not attempted to argue otherwise. This case presents none of the indicia of that "arbitrary quality of thoughtlessness" on the basis of which courts have condemned some school board actions in the desegregation area. See, e. g., *Hobson v. Hansen*, 269 F.Supp. 401, 497 (D.D.C.1967) (J. Skelly Wright, J.).

### Governing Legal Principles

■ With this perspective, we now turn to the applicable case law. It is now axiomatic that educational opportunity, where it is provided to some, must be provided to all on equal terms, and that separate educational facilities for different racial groups are inherently unequal. *Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1953) (*Brown I*). It is also beyond controversy that the primary responsibility for elucidating, assessing, and solving the problems attendant on disestablishing unequal educational facilities is placed on school authorities. *Brown v. Board of Education of Topeka*,

349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*). Plaintiffs concede that defendants' action was undertaken to accomplish, and will accomplish, the laudable end of eliminating racial imbalance in the high schools, which had not grown out of any purposeful or intentional action by the District in creating or perpetuating an imbalanced school system (*de jure* segregation), but rather out of residential living patterns over which the defendants had no control (*de facto* segregation). See *Keyes v. School District # 1, Denver, Colorado*, 413 U.S. 189, 208, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Gomperts v. Chase*, 329 F.Supp. 1193 (N.D.Cal.1971). Rather, plaintiffs' complaint is that the *means* used to accomplish this laudable end themselves are tainted by the allegedly discriminatory burden they place on plaintiffs' racial group. It is plaintiffs' view of things that they are being required to pay the entire price for integrated schools.

■ If, on its face, the action of the District Board appears to involve a racial classification which is "constitutionally suspect," the court must subject the Board's justification to the "most rigid scrutiny" and require that the Board carry "a far heavier burden of justification." *Hunter v. Erickson*, 393 U.S. 385, 392, 89 S.Ct. 557, 561, 21 L.Ed.2d 616 (1969), *citing Loving v. Virginia*, 388 U.S. 1, 10, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1968); *McLaughlin v. Florida*, 379 U.S. 184, 194, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Korematsu v. United States*, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944). Such action "will be upheld only if it is necessary, and not merely rationally related, to the accomplishment of a permissible state policy." *McLaughlin*, supra at 196, 85 S.Ct. 283, 290; *Hobson v. Hansen*, 269 F.Supp. 401, 506–08 (D.D.C.1967), aff'd sub nom. *Smuck v. Hobson*, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969).

It must be emphasized, however, that this stricter standard of judicial scrutiny

is imposed only *after* an aggrieved party has proved that racial discrimination exists. See, e. g., *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *Brown v. Board of Education of City of Chicago,* 386 F.Supp. 110, 123–24 (N.D.Ill.1974). It is racial discrimination against which the thrust of the relevant constitutional and statutory provisions is directed, and racial discrimination must be shown.

Plaintiffs have alleged that the plan to close Ravenswood and reassign its students was racially motivated, contending that the Board's action was the product of its repugnance to busing white students into the black neighborhood school.[39] Failing direct proof of racial motivation, plaintiffs ask us to draw an inference of racial discrimination from the statistical data they have presented which they allege show the burden of defendants' closure and integration plan to fall predominantly on black students. Having raised a prima facie case of racial discrimination, plaintiffs contend, the "heavy burden" or "compelling state interest" equal protection test is triggered.

■ The court disagrees.[40] First, the evidence which was presented pointed

---

**39.** Plaintiffs style the Board's Ravenswood closure plan as "inextricably tied to their unwillingness to abandon a 'freedom of choice' system which fosters racially separate schools." Plaintiffs' Memorandum in Support of Injunction at p. 5. They argue that since the voluntary transfer plan (of 1970, as modified in 1971) failed to produce racial balance throughout the schools, the defendants, refusing to force white students to attend the black school, opted instead to close it. This, they allege, brings the case within the rationale of *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) and *Monroe v. Board of Commissioners,* 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). The facts in those cases, however, were substantially different from those which pertain here in that in both *Green* and *Monroe* the school authorities, by instituting a "freedom of choice" or "free transfer" system, sought to effectuate a transition from a *de jure* racially segregated school system to a racially nondiscriminatory system. These programs, held the Supreme Court, did not meet the Board's affirmative duty to remedy past discrimination. In the instant case, of course, the District is not now and never has been under a court desegregation mandate. See *Gomperts v. Chase,* supra.

**40.** Even were we to infer racial discrimination from what plaintiffs assert to be the unequal busing burden placed on them by defendants' closure and reassignment plan, we would find that defendants have borne their "heavy burden of justification" by producing ample evidence of the necessity of their actions. The evidence shows to this court's satisfaction that a school closure was necessary, that objective, nonracial indicia pointed strongly to Ravenswood, and that the integration plan attendant upon the closure necessitating student reassignments was adopted with the sole-minded purpose of providing quality education to all high school students in the district.

In *Norwalk CORE v. Norwalk Board of Education,* 298 F.Supp. 213 (D.Conn.1969), aff'd 423 F.2d 121 (2d Cir. 1970), a case presenting strikingly similar facts to the one at bar, the district court, in holding that the closure of a black school and the busing resulting therefrom did not violate equal protection guarantees under the "heavy burden" test, see *id.* at 226, stated at 222:

. . . [T]he "burdens", if any, of busing and attendance at a non-neighborhood school, although statistically related to race, actually stem from a valid administrative decision against the continued location . . . of educational facilities in areas of underprivileged minority group concentration because of the detrimental effects on quality education which might result.

In affirming the lower court, the Second Circuit concluded, 423 F.2d at 124:

Plaintiffs would eliminate what they call unequal treatment by having, in effect, one white child bussed out of his neighborhood for every black child bussed out of his—in other words, deprive as many whites of neighborhood advantages as blacks are deprived by being bussed to schools predominately white. But the problem is not as simple as a one black, one white ratio. It is a question of the Board, with the facilities available having "acted in the utmost good faith, in a nonarbitrary and deliberate manner, in order both to insure racial balance and to provide high quality education."

We might note that the Board before us presented an even more compelling argument for closure than that presented in *Norwalk CORE,* in that in addition to the desire to maintain quality education, the Board here was faced with financial constraints which

completely away from a conclusion that the Board's action in choosing Ravenswood for closure was racially motivated. The Board representatives and other District administrative personnel informed the court at the hearing exactly how it was decided that Ravenswood rather than another high school should be closed, including extensive testimony regarding the District's financial problems, enrollment considerations, cost savings, and impact on students throughout the district. The testimony established that the bases for the decision were those described in the School Closure Report and set forth by the court, supra, and *only* those. There was absolutely no evidence that improper racial considerations, such as any reluctance to bus white students into the black school, crept into the closure analysis.

Second, while the court is aware that at times we must look behind the stated justifications for certain government action to ascertain the "real motivation" of officials, often having to rely solely on statistical evidence manifesting that the impact of state action creates a pattern of race discrimination which cannot be wholly fortuitous and racially neutral, usually there must be something more than a "naked statistical argument"— something that tends to make the stated justification sound unbelievable or otherwise unsatisfactory. Often the "something more" is found by analyzing alternative courses which could have been chosen and which would not have created the infelicitous impact complained of, see, e. g., *Green v. County of Kent,* 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Dean Milk Co. v. City of*

*Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951), thus raising the inference that total good faith was lacking. Sometimes the historical context of the government's conduct lends a certain "color" to the statistical argument of racial discrimination, in which case a court might more readily find racial discrimination by coupling the history of segregation with the statistical differential racial impact, see, e. g., *Reitman v. Mulkey,* 387 U.S. 369, 373, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); *Kennedy Park Homes Assn v. City of Lackawanna,* 318 F.Supp. 669 (W.D.N.Y.), *aff'd,* 436 F.2d 108 (2d Cir. 1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); *Sisters of Prov. of St. Mary of Woods v. City of Evanston,* 335 F.Supp. 396 (N.D.Ill.1971); *Hobson v. Hansen,* 269 F.Supp. 401, 496 (D.D.C.1967), *aff'd sub nom. Smuck v. Hobson,* 132 U.S.App. D.C. 372, 408 F.2d 175 (1969); see also cases cited *Brown v. Board of Education of City of Chicago,* supra, 386 F.Supp. at 124 n. 8. In the instant case, we perceive no alternative courses of action open to the school board to solve its myriad problems which are so *clearly* better as to surround its stated justification with any suspicion whatsoever, and the historical context of the District's action here in no way lends that "color" to plaintiffs' statistical argument with which like allegations in the context of a history of *de jure* discrimination are tinted. *Gomperts,* supra. Contrast *Brown v. Board of Education of City of Chicago,* supra, 386 F.Supp. at 124–25. Plaintiffs' statistical argument, which is at best inconclusive on the issue of the magnitude and incidence of the busing burden (if indeed busing to achieve inte-

---

made closure of at least one high school imperative, a fact plaintiffs have made no attempt to refute. Contrast *Brice v. Landis,* 314 F.Supp. 974, 978 (N.D.Cal.1970). Moreover, there seemed to be some suggestion of racial considerations in *Norwalk CORE,* which is totally lacking here, in the Norwalk Board's possible reliance on "the existence of racial hostilities and fears" in deciding on the black school closure. See 298 F.Supp. at 218; *Norwalk CORE,* supra, 423 F.2d at 125–26 (Kaufman,

Circuit Judge, dissenting); see also *Taylor v. Louisiana,* 370 U.S. 154, 82 S.Ct. 1188, 8 L.Ed.2d 395 (1962), and cases cited 423 F.2d at 126 n. 5 (fear of hostile reaction to a speaker's message is insufficient reason to limit his First Amendment right to speak). We have *no* evidence that "racial hostilities" or the "fear of white flight" from the school system played any role in the Board's action targeting Ravenswood for closure.

gration under the circumstances of this case can be deemed a "burden" of constitutional significance [41]), thus stands alone and as such is insufficient to invoke the stricter standard of review.[42]

■ Having determined to apply instead the traditional standard of review under the Fourteenth Amendment, we cannot say that the Board's action was invidious or irrational. As we stated at the outset of this opinion, this court does not sit here to judge whether the Board adopted the *best* plan possible to solve its integration, financial, and reduced enrollment problems. Lest it be forgotten, we reiterate the observation of many courts that school administrators must be given a "broad discretion" and a "wide latitude" in fashioning workable plans to comply with the requirements of constitutional principles. This is so, for these individuals, specially trained as they are in methods designed to provide quality education, and familiar as they are by virtue of their experience in and proximity to daily operations with the practical difficulties inherent in maintaining a smooth-running school system, possess an expertise in solving school problems not possessed by courts. We are completely in accord with the following statement taken from *Deal v. Board of Education,* 369 F.2d 55, 61 (6th Cir. 1966), *cert. denied,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967):

> In dealing with the multitude of local situations that must be considered and the even greater number of individual students involved, we believe it is the wiser course to allow for the flexibility, imagination and creativity of local school boards in providing for equal opportunity in education for all students. It would be a mistake for the courts to read *Brown* in such a way as to impose one particular

concept of educational administration as the only permissible method of insuring equality consistent with sound educational practice. We are of the view that there may be a variety of permissible means to the goal of equal opportunity, and that room for reasonable men of good will to solve these complex community problems must be preserved.

See also *Brown II,* supra, at 299; *Bell v. West Point Municipal Separate School District,* 446 F.2d 1362, 1364 (5th Cir. 1971) (Clark, Circuit Judge, concurring); *Allen v. Asheville City Board of Education,* 434 F.2d 902, 905 (4th Cir. 1970); *Norwalk CORE v. Norwalk Board of Education,* 423 F.2d 121, 124–25 (2d Cir. 1970) (Kaufman, Circuit Judge, dissenting on other grounds); *Gomperts v. Chase,* supra, at 1195; *Brice v. Landis,* 314 F.Supp. 974, 977 (N.D.Cal.1969).

Cases on which plaintiffs rely are readily distinguishable on the grounds that either (1) they presented challenges to school board plans found inadequate to remedy past *de jure* segregation, see, e. g., *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Monroe v. Board of Commissioners,* 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); *Clark v. Board of Education of Little Rock,* 449 F.2d 493 (8th Cir. 1971); *Lee v. Macon County Board of Education,* 448 F.2d 746 (5th Cir. 1971); *Bell v. West Point Municipal Separate School District,* 446 F.2d 1362 (5th Cir. 1971); *Haney v. County Board of Education,* 429 F.2d 364 (8th Cir. 1970); *Hall v. St. Helena Parish School Board,* 417 F.2d 801 (5th Cir. 1969); *Henry v. Clarksdale Municipal Separate School District,* 409 F.2d 682 (5th Cir. 1969); *Felder v. Harrett County Board of Education,* 409 F.2d 1070 (4th Cir. 1969); *Smith v. St. Tammany Parish School Board,* 302 F.Supp. 106 (E.D.La.

---

41. See *Norwalk CORE v. Norwalk Board of Education,* 298 F.Supp. 213, 222 (D.Conn. 1969), aff'd, 423 F.2d 121 (2d Cir. 1970); *Allen v. Asheville City Board of Education,* 434 F.2d 902, 907 (4th Cir. 1970).

42. See *Brown v. Board of Education of City of Chicago,* 386 F.Supp. 110, 124 (N.D.Ill.1974), citing *Jefferson v. Hackney,* 406 U.S. 535, 548, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972).

1969); and/or (2) they presented facially discriminatory government action for which was offered no justification, or a justification which was constitutionally invalid (such as the "fear of white flight" or "racial hostilities"), see, e. g., *Lee v. Macon County Board of Education,* supra, at 753–54 (closure of black schools, causing overcrowding in remaining schools, justified by board solely on basis that "white students [would] flee this school system"); *Bell v. West Point Municipal Separate School District,* supra, at 1363 (same); *Felder v. Harrett County Board of Education,* supra, at 1074 (closure of black schools with no justification offered except for a "cryptic reference to bus routes"); *Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920, 929 (2d Cir. 1968) (government failure to attempt to relocate displaced minorities following urban renewal to same extent it was done for whites justified by delay such attempt would impose on urban renewal plan); *Brown v. Board of Education of City of Chicago,* 386 F.Supp. 110, 123–25 (N.D. Ill.1974) (8% staffing expenditure differential favoring white over black schools justified on grounds of administrative convenience and teacher-employee desires); *Brice v. Landis,* 314 F.Supp. 974, 977–78 (N.D.Cal.1969) (closure of apparently suitable black school, resulting in overcrowding of other schools, justified on ground that operation of closed school was "uneconomical" where evidence indicated otherwise).

The record here contains more than ample evidence to support the court's finding that the Board, in determining that Ravenswood was to be closed, acted in the utmost good faith, in a deliberate and nonarbitrary manner, without improper racial motivation or arbitrary disregard of the rights of a minority group, in order both to insure racial balance and to provide high quality education.[43] It cannot be disputed that where constitutional guarantees have not been transgressed by government action, as they have not been here, a particular school facility may be terminated for sound educational reasons. See, e. g., *Bell v. West Point Municipal Separate School District* supra; *Wright v. Board of Public Instruction,* 431 F.2d 1200 (5th Cir. 1970). There is no dearth of evidence here that such sound educational reasons existed for the Ravenswood closure decision.

The Board's ends, and the means chosen to achieve those ends, were both well within the scope of the law and within the scope of the Board's discretion and authority.

**43.** Nor, it bears repeating, can plaintiffs realistically argue that the defendants' actions manifest that "arbitrary quality of thoughtlessness" recognized by Judge J. Skelly Wright to be "as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme." *Hobson v. Hansen,* 269 F.Supp. 401, 497 (D.D.C.1967), *aff'd sub nom. Smuck v. Hobson,* 132 U.S.App.D.C. 372, 408 F.2d 175 (1969). The school closure decision was the product of some eight months of intensive study by numerous specially trained individuals who considered at length all of the relevant parameters (such as finances, enrollments, and the need and desire for integrated schools) and none of the irrelevant ones (such as the "fear of white flight" or a desire not to bus white children into black neighborhoods), and who were aided by community input through questionnaires and public meetings. The decision arrived at by the committee and eventually the Board was neither "arbitrary" nor "thoughtless". The most that can be said is that plaintiffs would have preferred a different result. In addition, we note that while the Board's actions certainly withstand constitutional scrutiny without it, the fact that the closure and reassignment plan had express HEW approval is not without significance. See, e. g. *Chambers v. Iredell County Board of Education,* 423 F.2d 613, 617 (4th Cir. 1970). The Office of Civil Rights, HEW, deemed the plan as putting the District in full compliance with its Title VI responsibilities and stated that OCR "genuinely appreciate[d the District's] commitment to an equal opportunity for all of the students in the . . . District." See Letter of January 16, 1976, from OCR/HEW to Superintendent Chaffey, Exhibit 5 to Chaffey Affidavit. The viewpoint of a government agency, specifically created to monitor compliance with the precise statutory and constitutional provisions in issue here, and particularly familiar with and expert in dealing with such problems, is not lightly to be regarded.

For the foregoing reasons, it is the opinion of this court that defendants are entitled to judgment in their favor, and it is so ordered. The herein opinion shall constitute the court's findings of fact and conclusions of law.

APPENDIX I